Lybarger Unemployment Compensation Case.
Department of Labor and Industry, Bureau of
Employment Security *v.* Unemployment
Compensation Board of Review,
Appellant.

472

Argued January 5, 1965. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Jerome H. Gerber,* with him *Sidney G. Handler,* for appellants.

*Morley W. Baker,* Assistant Attorney General, with him *Walter E. Alessandroni,* Attorney General, for Department of Labor and Industry, Commonwealth of Pennsylvania, Bureau of Employment Security, appellee.

*M. H. Goldstein, Michael Brodie,* and *Goldstein and Barkan,* for interested party, under Rule 65.

OPINION BY MR. JUSTICE ROBERTS, July 1, 1965:

This is an appeal from a finding by the Superior Court that claimant-appellants were not entitled to unemployment compensation benefits under the provisions of the Pennsylvania Unemployment Compensation Law.[1]

Claimants are members of Local 591, ILGWU, and are employed as chain machine operators by Talon, Incorporated, in Meadville, Pennsylvania. In 1961, the pertinent year for purposes of this case, the terms and conditions of claimants' employment were dictated by a contract negotiated through the collective bargaining process between their union and Talon. That contract provided, in part:

"Section 2: Working Schedule (a) Beginning in January 1961, the Chain Machine personnel shall be employed as follows: 1. In January, the Company will

---

[1] Act of December 5, 1936, (1937) P. L. 2897, as amended, 43 P.S. §751 et seq.

adjust personnel, retaining by seniority the number of operators required to maintain production at the level of a normal 40-hour week. 2. Employees with sufficient seniority to remain at work shall be kept as operators until the pay period when their gross earnings received from the Company since January amount to five thousand dollars ($5,000), plus-or-minus fifty dollars ($50). Such operators will then go on layoff for the remainder of the year or until all younger operators have been recalled, and additional ones are required in seniority order. 3. Younger operators on layoff will be recalled in seniority order in sufficient number to maintain production at the level of a normal 40-hour work week for the remainder of the calendar year. 4. At the first of the year, the younger operators will be laid off and older operators recalled in seniority order from layoff to maintain the schedule at a normal 40-hour work week. These operators will continue working until they have received gross earnings of five thousand dollars ($5,000), plus-or-minus fifty dollars ($50), when they will be laid off and younger operators called in, as set forth in Items 2 and 3, above."

In 1961, claimants reached the specified $5,000 wage limitation in early October. Pursuant to the above contractual arrangement, they were "laid off" and the work which they had been performing was assigned to substitutes with less seniority. Claimants then filed applications for unemployment compensation benefits. In November, the Bureau of Employment Security found them ineligible for benefits because they were unavailable for suitable work under §401(d)[2] and be-

---

[2] Act of December 5, 1936, P. L. (1937) 2897, §401(d), as amended by Act of March 30, 1955, P. L. 6, §4 and Act of December 17, 1959, P. L. 1893, §7, and Act of September 14, 1961, P. L. 1301, §3. The subsection was subsequently amended by the Act of March 24, 1964, P. L. 53, §5, 43 P.S. §801(d).

cause they had *voluntarily* left work under §402(b)(1)[3] of the Pennsylvania Unemployment Compensation Law.

Section 401(d) provides: "Compensation shall be payable to any employe who is or becomes unemployed, and who— .... (d) Is able to work and available for suitable work ...."

Section 402(b)(1) provides: "An employe shall be ineligible for compensation for any week— .... (b)(1) In which his unemployment is due to voluntarily leaving work without cause of a necessitous and compelling nature ...."

From the Bureau's finding of ineligibility under the above two sections, claimants appealed to the Unemployment Compensation Board of Review which assigned the matter to a referee. After a hearing, the referee reversed the Bureau's finding of ineligibility under §402(b)(1) (voluntary quit) but affirmed the Bureau's decision that the employees were ineligible for benefits under §401(d) (availability for work). Claimants then appealed the referee's decision to the Board of Review which reversed the referee and held that the claimants were eligible for benefits. The Bureau of Employment Security appealed the Board's decision to the Superior Court[4] which reversed the Board and found claimants ineligible for benefits under both sections, reaching thereby the same result as the initial determination by the Bureau. 203 Pa. Superior Ct. 336, 201 A. 2d 310 (1964). Claimants, joined by Talon, filed a petition for allocatur which we granted.[5] 203 Pa. Superior Ct. xxxix.

---

[3] Act of December 5, 1936, P. L. (1937) 2897, §402(b)(1), as amended, 43 P.S. §802(b)(1).

[4] Claimants and Talon were permitted to intervene as parties appellee.

[5] The disposition of the claims of 29 other employees of Talon, who became unemployed under circumstances similar to those represented by claimants in this case, are also dependent upon the determination of the instant appeal.

Careful review of the record, the briefs and the oral arguments in this case convinces us that the order of the Superior Court must be affirmed on the ground that claimants voluntarily left work and that unemployment compensation benefits are therefore precluded under §402(b)(1) of the Act.

In arriving at our determination of these appeals, we are aided considerably by the guidelines set forth in the Legislature's declaration of public policy found in §3 of the Act.[6] That section is not merely a perfunctory preface but is, rather, the keystone upon which the entire Act rests and the basis upon which the individual sections of the Act must be interpreted and construed. *Barclay White Co. v. Unemployment Compensation Bd. of Review*, 356 Pa. 43, 50 A. 2d 336 (1947), cert. denied, 332 U.S. 761, 68 S. Ct. 63; *Harris Unemployment Compensation Case*, 185 Pa. Superior

---

[6] Act of December 5, 1936, P. L. (1937) 2897, §3, 43 P.S. §752. "Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of the Commonwealth. Involuntary unemployment and its resulting burden of indigency falls with crushing force upon the unemployed worker, and ultimately upon the Commonwealth and its political subdivisions in the form of poor relief assistance. Security against unemployment and the spread of indigency can best be provided by the systematic setting aside of financial reserves to be used as compensation for loss of wages by employes during periods when they become *unemployed through no fault of their own. The principle of the accumulation of financial reserves*, the sharing of risks, and the payment of compensation with respect to unemployment meets the need of protection against the hazards of unemployment and indigency. The Legislature, therefore, declares that in its considered judgment the public good and the general welfare of the citizens of this Commonwealth require the exercise of the police powers of the Commonwealth in the enactment of this act for the compulsory setting aside of unemployment reserves *to be used for the benefit of persons unemployed through no fault of their own.*" (Emphasis supplied.)

Ct. 235, 138 A. 2d 207 (1958); *Fazio Unemployment Compensation Case,* 164 Pa. Superior Ct. 9, 63 A. 2d 489 (1949); *Michalsky Unemployment Compensation Case,* 163 Pa. Superior Ct. 436, 62 A. 2d 113 (1948). More particularly, the relationship between §3 and §402(b)(1) is close and complementary, calling for the construction of §402(b)(1) in the light of the fuller, more comprehensive, and more explicit language of §3. *Dept. of Labor and Industry v. Unemployment Compensation Bd. of Review,* 148 Pa. Superior Ct. 246, 24 A. 2d 667 (1942), allocatur refused, 148 Pa. Superior Ct. xxiii; *Labor and Industry Dept. v. Unemployment Compensation Bd. of Review,* 133 Pa. Superior Ct. 518, 3 A. 2d 211 (1938), allocatur refused, 133 Pa. Superior Ct. xxxiii.

The §3 declaration of public policy persuades us that legally sustaining the program of planned unemployment agreed upon by Talon and claimants would contravene the language and intent of §402(b)(1). Such a determination would also violate the policy upon which the Act is based and would surely provide a method by which the effectiveness of the program of unemployment compensation benefits would eventually be nullified.

An examination of the §3 declaration of public policy reveals that the Act is aimed at conditions arising out of "involuntary unemployment", the very concept with which §402(b)(1) is concerned. The use of the word "involuntary" in the declaration of public policy section is enlightening because the Legislature equates that word with the phrase "through no fault of their own." Can it reasonably be said that claimants in the instant case found themselves unemployed "through no fault of their own"? Obviously not. The terms of their employment contract were considered by them, voted upon by them, and agreed upon by them

with their employer through their union bargaining agents.[7]

Clarification of the word "involuntary" further particularizes the kind of situation which the Act is designed to alleviate. It is to provide protection against the "hazards of unemployment." Clearly this refers not to unemployment arranged, agreed upon, and sanctioned by the employer and employee but, rather, to unemployment which is attendant upon the vicissitudes. of the economic climate.[8] The purpose of the Act is to prevent the worker from becoming the innocent pawn of forces and movements beyond his control. Suffice it to say that this is a large enough undertaking without increasing the burden upon the unemployment compensation system by adding to its protective cover situations of "unemployment" devised by the employer and his employee which, by contract, are made virtually certain to occur and reoccur at regular intervals. Surely, at this stage of experience with the system, it must be obvious that a great and basic difference exists, economically and legally, between the nature of involuntary unemployment as contemplated by the Act and that "unemployment" continuously and deliberately planned and created by the contract arrangement involved at Talon.

---

[7] Claimants are bound by the agreement negotiated on their behalf by their union representatives. *Pusa Unemployment Compensation Case*, 178 Pa. Superior Ct. 348, 115 A. 2d 791 (1955); *Mattey Unemployment Compensation Case*, 164 Pa. Superior Ct. 36, 63 A. 2d 429 (1949).

[8] Although it was recognized in *Sturdevant Unemployment Compensation Case*, 158 Pa. Superior Ct. 548, 45 A. 2d 898 (1946), that unemployment could be caused by forces "not directly or solely attributable to economic or depressional causes," that case clearly contemplated causes which are outside the control of employer and employee such as the disorganization accompanying wartime mobilization which was involved in that case.

It has been pointed out that one of the purposes of the Unemployment Compensation Law was to encourage the reduction of unemployment through the incentive of reduced employer contributions to the unemployment compensation fund for those who achieve a stabilization of employment in their businesses. See *Sturdevant Unemployment Compensation Case,* 158 Pa. Superior Ct. 548, 563, 45 A. 2d 898, 906 (1946). Although we recognize that this secondary aim must not take precedence over the paramount objective of providing relief to employees who leave work through no fault of their own, we are equally convinced that the employer and employee must not be permitted to create "unemployment" in order to secure payments from the unemployment compensation fund by means of a contractually agreed upon system which does not discourage unemployment but actually creates and fosters it on a periodic and continuing basis.

In concluding that claimants voluntarily left their employ within the meaning of §402(b)(1), we take cognizance of *Gianfelice Unemployment Compensation Case,* 396 Pa. 545, 153 A. 2d 906 (1959), which claimants urge upon us as authority for the proposition that their labor agreement with Talon has no bearing upon the issue of the voluntariness of their leaving. That case, however, is completely distinguishable from the instant case both on its facts and its underlying policy rationale and can not be deemed to be controlling in the instant situation.

*Gianfelice* involved a man who, having attained the age of 68, became subject to the terms of an employer-union contract under which an employee, after reaching the age of 68, could continue work only with the consent of the employer. Not obtaining that consent, claimant filed for unemployment compensation benefits shortly after his 68th birthday. In holding that this retirement provision of claimant's employment con-

tract did not make the retirement voluntary, the Court's decision carefully and wisely limited the language in the case to its facts.

In *Gianfelice* the Court felt that the labor agreement was entered into in order to restrict the employer's right to dismiss at will until the employee reached a certain age and that it could not be said that by seeking this protection against arbitrary dismissal by the employer, the employee voluntarily quit once he reached the age where his employer could dismiss at will.

Here the situation is exactly the opposite. Employees who, on the basis of seniority, would ordinarily have the right to work as long as work existed, gave up that right and agreed that upon reaching the $5,000 wage mark, they would relinquish their positions to junior employees.[9]

Unlike *Gianfelice,* the instant case does not present a situation where an employee merely becomes available for retirement against his will. Instead, what is presented here is a planned, intentional system of unemployment devised for the purpose of seeking to create eligibility for benefits from the unemployment compensation fund. The retirement situation in *Gianfelice* can in no way be analogized to the contrived periodic "lay-offs" involved here and the contemplated inclusion of payments from the unemployment compensation fund in the claimants' yearly employment benefits. This "lay-off" comes not as the result of any considerations for the proper performance of work or

---

[9] Although the employment contract provided for a rehiring of senior employees before the January recall date if the amount of work at Talon required it, and despite the fact that 1961 was a record year for the company, at no time during that year was the full work force of chain machine operators actually employed by the company all at the same time.

the lack of work[10] but, instead, upon the mere receipt of $5,000 in wages, an arbitrarily fixed amount, in any one year. In addition, re-employment was not only certain in this case, but guaranteed by contract on a regular, scheduled basis.

The §3 clarification of the word "involuntary" as meaning "through no fault of their own" brings out a major distinguishing characteristic between the present case and *Gianfelice*. In the latter case it could be said that claimant lost his position through no fault of his own. Indeed, the agreement which he, through his union, entered into, prolonged the period during which retirement and unemployment would not occur. The agreement made him secure in his job until he reached a certain age, at which time he could be retired. In the instant case, on the other hand, we find not an effort to prolong the happening of an inevitable event which gives rise to unemployment but the creation of a new kind of event, a new condition which will, by mutual consent, automatically result in laying off workers. Surely then, it can not be said that claimants were laid off through no fault of their own. It was their ratification of the employment agreement

---

[10] Despite the fact that the work which claimants had been performing was not discontinued by Talon but merely reassigned to junior employees, appellants have endeavored to convince us that the actual reason for laying off claimants was lack of work. However, claimants' argument can not erase the fact that this condition of lack of work was created by the "two platoon" system embodied in the labor contract. There will always be lack of work for some employees if an employer makes it part of his employment practice to deliberately recruit almost twice the number of men he needs for the amount of work he has to be done. And when the system, arising out of an employer-employee agreement, creates these unemployed persons, those persons can not be deemed, in the face of that plan, to be involuntarily unemployed. Having authorized the initiation of the program and having participated in its execution, the employees may not be heard to complain of the resulting effect of their agreed scheme upon them.

which created the entire set of circumstances of which they now claim to be the "victims." It was part of their agreed plan that upon reaching the $5,000 wage limit they would assume the very status of which they now complain.

Therefore, the factual circumstances involved in this case,[11] along with the totally dissimilar consequences which flow from the contract here,[12] make reliance upon the *Gianfelice* decision inappropriate.[13]

As the §3 declaration of public policy notes, the foundation of the unemployment compensation system upon which the efficacy and, indeed, the source of life of the program rests, can be found in the principle of the accumulation of financial reserves. The principle of accumulations is based upon the theory that by contributions of employers throughout the state, a reserve fund can be accumulated. From this fund, workers

---

[11] A comparison of the contractual provisions in *Gianfelice* and those involved here also produces an interesting difference between the two cases. In *Gianfelice* the contractual arrangement provided: "A participant may remain in service of the Company after his attainment of age 68 or July 1, 1952, whichever last occurs, only with the consent of the company . . . ." It can be seen that that provision leaves it within the discretion of the employer whether the employee is actually laid off.

In the contract involved in this case, however, claimants agreed that when they had received $5,000 in wages for that year, they would "then go on layoff for the remainder of the year." Their unemployment, therefore, was not the result of a discretionary act by the employer but an automatic consequence of their agreement.

[12] Obviously what was here planned was yearly pay of $5,000 *plus* whatever unemployment compensation sums could be secured during the period October 1 to December 31 of each year.

[13] Under the most recent amendments to the Unemployment Compensation Law, the result of the *Gianfelice* case would be significantly altered. The 1964 amendments reduced or eliminated benefits under the Act where, as in *Gianfelice*, the claimant was receiving a retirement pension or annuity payments. Act of March 24, 1964, P. L. 53, §6, 43 P.S. §§804(c)(2), 804(d)(4).

who are unemployed through no fault of their own may receive payments to cushion the hard economic blow which unemployment nearly always inflicts. The life of the system literally depends upon the existence of a fund out of which those payments can be made. Quite obviously, the fund can not remain healthy and viable if sums are removed not only to relieve the economic distress which accompanies unemployment due to natural fluctuations of the economy, but also are removed recurrently, systematically, and by calculated design as an aspect of an employer-employee contract.[14]

The fund must be used only in accordance with its statutorily stated purpose. It must not be used as an integral part of an employer-employee contract which is deliberately designed to provide the employer with a readily available labor force[15] and to defray the cost

---

[14] The fact that the fund is indebted to the federal government in excess of $131,000,000 is persuasive evidence of the need for protecting the solvency of the fund against withdrawals made under the aegis of claims arising out of artificially, albeit artfully, created unemployment. See Bureau of Employment Security, Statistical Information Bulletin No. 161, December, 1964.

[15] Claimants' brief readily admits the purpose of the unique labor contract involved here: "What the agreement did do was to give the junior employees an opportunity to avoid forfeiture of their places on the seniority list and to periodically renew and develop their skills and proficiencies as chain machine operators. This was done so that as the most senior men eventually left active employment those junior could readily achieve a more permanent, stable and desirable place in the labor market. At the same time *the employer benefited by having the largest possible pool of highly trained technicians available should its employment needs expand* or, in any event, to replace the older men that will eventually be gone." (Emphasis supplied.)

While the stated purposes behind the contract may have been helpful to the employer and beneficial to some of its employees, reference to the §3 declaration of public policy makes it abundantly clear that the unemployment compensation system was not cre-

of such undertaking by withdrawals from the common trust fund which is contributed to by all covered employers in Pennsylvania for the benefit of involuntarily separated employees.[16] Neither the employer nor the employee—alone or together—may remold the unemployment compensation system to serve their private interest in securing payments of benefits from the common fund by agreement as here attempted.

In support of their position, claimants also rely upon §701 of the Act[17] which provides that an employee may not waive or release any of his rights under the Act. The applicability of this section only becomes relevant, however, once it is established that the employee has rights to benefits under the Act. In that event, §701 prohibits a waiver of such rights. Obviously this section may not be used to establish the very issue in controversy—that is, whether such rights exist.

In addition, it is significant, as the Court in *Gianfelice* noted, that although an employee may not waive rights to which he is entitled, neither can the employer and employee "agree that the latter receive benefits when the law precludes such benefits."[18]

ated in order to subsidize such programs to the detriment of eligible beneficiaries and contributing employers.

[16] The record shows that Talon, Incorporated, contributed at the maximum 4% rate during the years 1960, 1961, and 1962, and that from 1949 through 1962 its total contributions amounted to $1,822,422 while the total benefits paid to its employees from the fund amounted to $3,230,752.

At all levels of adjudication in this entire proceeding, including the petition for allocatur, the employer urged payment of benefits to cover these contractually agreed "lay-offs" just as though the employer himself was providing an additional "fringe benefit" for its employees, utterly disregarding the trust characteristics of the state-wide unemployment compensation fund.

[17] Act of December 5, 1936, P. L. (1937) 2897, §701, 43 P.S. §861.

[18] 396 Pa. at 554, 153 A. 2d at 911.

The Unemployment Compensation Fund is maintained by all the employers throughout the Commonwealth who are covered by the Act and who contribute to it for the benefit of their employees, see *Pennsylvania State Chamber of Commerce v. Torquato,* 386 Pa. 306, 125 A. 2d 755 (1956), cert. denied, 352 U.S. 1024, 77 S. Ct. 589 (1957). Any scheme by which an employer and employee attempt to invade that fund for purposes other than those for which it was designed and is being maintained thereby jeopardizes its solvency and destroys its trust characteristics and, therefore, must not be permitted.

The decision of the Bureau and the Superior Court denying benefits to claimants is therefore affirmed on the basis of §402(b)(1) of the Unemployment Compensation Law. In light of our conclusion, we need not consider the second issue raised on this appeal concerning claimants' availability for work under §401(d).

Order affirmed.

Mr. Justice EAGEN dissents.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The majority opinion asks: "Can it reasonably be said that claimants in the instant case found themselves unemployed 'through no fault of their own'?"

The majority answers its own question with "Obviously not". I cannot agree with that "Obviously not." I would say, on the contrary, that it is quite obvious that the claimants became unemployed through conditions utterly beyond their capacity to avoid or alter. They became unemployed because there simply was not enough work for them to be employed continuously, they became unemployed because their employer did not have enough contracts to keep the wheels of the mill turning continuously for all the employees, they became unemployed because, like the rain and the sunshine, the

prevailing economic conditions were beyond their will to control. I would like to explain what happened.

On October 2, 1961, Freeman Lybarger, member of Local 591, International Garment Union, and employed as a chain machine operator with Talon, Incorporated, in Meadville, was notified by his employer that he had been placed in the status of temporary lay-off. He applied for unemployment compensation which was refused by the Bureau of Employment Security. He appealed to the Unemployment Compensation Referee who affirmed the decision of the Bureau. Lybarger then appealed to the Unemployment Compensation Board of Review, which reversed the decision of the Referee and directed that unemployment compensation be paid. The Bureau of Employment Security, Department of Labor and Industry,[1] appealed the Board's decision to the Superior Court which reversed the Board of Review, thus denying unemployment compensation, and the case then came to us.

Although Arthur W. Mattocks, as a co-worker with Lybarger, was a party in the proceedings in the tribunals below, the Superior Court treated the case in the singular number, and I, for the sake of clarity, will do the same. The majority, unfortunately, uses the plural number throughout its opinion, apparently deciding the case on policy, rather than on the specific facts here involved.

Some time prior to January 1, 1961 (the effective date of the contract), Local 591, ILGWU, entered into a collective bargaining agreement with the Talon Company, whereby the company was to prepare a work schedule which would assure work to all those highest on the seniority list and then, as those workers earned

---

[1] With Freeman Lybarger and Arthur W. Mattocks, a co-worker, as intervening appellees, and Talon, Inc., intervening as appellant.

the total sum of $5,000 in wages, junior workers would be called, and the seniors would be laid off until the first of the following year or until such time that there was work for them also, if this occurred before the beginning of the ensuing year. Claimant was laid off in accordance with that provision, even though he desired to continue his employment.

In denying Lybarger compensation the Board declared him ineligible under provisions of the Unemployment Compensation Law: §401. "Compensation shall be payable to any employe who is or becomes unemployed, and who . . . (d) Is able to work and available for suitable work . . ." 43 P.S. §801(d). §402(b)(1) ". . . An employe shall be ineligible for compensation for any week . . . (b)(1) In which his unemployment is due to voluntarily leaving work without cause of a necessitous and compelling nature." 43 P.S. §802.

The Bureau decided that Lybarger's cessation of employment was voluntary and that, during the period of his unemployment, he did not hold himself available for "suitable work." The Referee held that Lybarger had not left his work voluntarily, but decided against him on the proposition that he did not hold himself available for work following his being laid off. The Review Board reversed the Referee, finding that the claimant did hold himself available for work. The Superior Court, by a vote of 4 to 3, reversed the Board and decided that the claimant was ineligible for compensation on both counts.

This case has to do with one of the most vital sociological problems of American society and, for that matter, world society as well—unemployment. It would seem that from time immemorial there was never an appreciable period when there was enough remunerative work for all able-bodied men who wanted to work. This unemployment condition was so chronic that ignorance, plus superstition, plus, first of all, the selfish

motivations of those entrenched in power—financially, militarily, dictatorially, and feudally—established a permanent classification of society into various levels, the lowest one, of course, being the poor. Somehow it was assumed that it was the fault of the poor themselves that they did not occupy a more elevated social status, practically everybody ignoring that the poor lacked social standing because they lacked money, and that they lacked money because they lacked remunerative employment. Occasionally a Timon of Athens, a Caesar or a Croesus would distribute money or food among the destitute which would relieve their torturesome penury for a holiday or Sunday but they needed to eat on Monday and the rest of the week as well. This food or money was not easily forthcoming because they still had no jobs. Society lacked stability.

It was not until the latter part of the 19th century and the beginning of the 20th, that there arose a serious appreciation of the fact that poverty, to a great extent, was the responsibility of society, and that the festering sores of want on the body economy of the nation could be healed only through the correction of the problem of unemployment. Shorter work days, shorter work weeks, paid vacations and paid-for holidays were instituted and they all helped to spread employment over a larger percentage of the population but, even after the application of these salubrious medicaments, unemployment, like a recurrent smallpox, still disfigured the face of the land.

If an able-bodied man, skilled, trustworthy, earning sufficient wages to maintain himself and family, was dismissed, not because of any decreased skill or disloyalty on his part, but simply because the employer had no more employment for him—what then? England, in 1911, was apparently the first country to give recognition to the responsibility of government and society to build a bridge of dignified assistance, a

bridge which would span the marshes of want, over which the dismissed employees could proceed to the security of another job, or a re-hiring at his old job. States in the United States studied England's bold experiment and in time enacted statutes varying in types of benefits and in procedures. In December, 1936, the Commonwealth of Pennsylvania, acknowledging the undebatable reality that "economic insecurity due to unemployment is a serious menace to the health, morals and welfare of the people of the Commonwealth," enacted the Unemployment Compensation Law (Act of December 5, 1936, P. L. (1937) 2897 (43 P.S. §751 et seq.)). It has been amended from time to time but the basic principles have remained the same, namely, that when an employee through no fault of his own loses his job and holds himself available for another job, he is entitled to unemployment compensation.

In *Gianfelice Unempl. Compensation Case,* 396 Pa. 552, Justice COHEN said: "The Unemployment Compensation Law was enacted to alleviate the hardships attendant upon unemployment . . . It is a remedial statute . . . to provide support for workers who are unemployed . . ." In *Sturdevant Unemployment Comp. Case,* 158 Pa. Superior Ct. 548, 559, Judge RENO said that the purpose of the Act is "to relieve economic insecurity due to 'involuntary unemployment.'" Also that "it is primarily intended for the benefit of unemployed workers." How is it to be interpreted? Judge RENO declared that "the Unemployment Compensation Law is remedial, humanitarian legislation of vast import. Its benefits sections must be liberally and broadly construed."

Even the Supreme Court of the United States has looked at the humanitarian purposes of legislation in upholding Acts of Congress. For instance, in the case of *Phillips Co. v. Walling,* 324 U.S. 490, 493, Justice MURPHY referred to the Fair Labor Standards Act as

"humanitarian and remedial legislation," and said that to depart from its provisions would be to "abuse the interpretive process and to frustrate the announced will of the people."

The Unemployment Compensation Law of Pennsylvania is clearly humanitarian legislation and when one deals with laws dedicated to humanity, one does not measure with a surveyor's rule but with the Golden Rule. The Superior Court has in numerous decisions given a liberal and broad interpretation to the Unemployment Compensation Law, and so has this court, but in the present case the majority inexplicably has departed from the path lighted by the star of liberal construction which was announced in the *Sturdevant* case. The majority announces a rigid interpretation which is not only foreign to the intendment of the Act but which startlingly offends against the statute and previous decisions of this Court, as we will see.

The fault of the majority opinion's reasoning resides in the fact that it takes the wrong date for determining Lybarger's status. I repeat that I regret the majority opinion has confused the issue by speaking generally and not restricting its adjudication to Lybarger's case which is the one on appeal. Of course, the decision on Lybarger will apply also to Arthur W. Mattocks, a co-worker, and eventually to the other 29 chain machine operators in the same employment status as Lybarger and Mattocks. Nevertheless, since the appeal we are considering is from the Superior Court which specifically adjudicated Lybarger's case, the majority opinion should have treated Lybarger's case alone. By extending the periphery of discussion and generally and abstractly considering all employees, the majority has introduced an element of looseness into the case which does not make for precise disposition of the specific problem involved.

The Superior Court asked in its majority opinion: "Did Lybarger cease working voluntarily?" And it answered its own question with an affirmative, as the majority opinion here answered its own question with an affirmative response. This answer is wrong because the Superior Court and the majority here did not adjudicate Lybarger's status as of the moment Lybarger laid down his tools. They adjudicated his status as of the date when his union agreed to the collective bargaining agreement with their employer.

The majority opinion says, speaking of the employees generally, that "The terms of their employment contract were considered by them, voted upon by them, and agreed upon by them with their employer through their union bargaining agents."

The majority, in this observation, wholly ignores the Unemployment Compensation Law, §701 of which, in language as clear as the waters of a mountain brook, declares: "No agreement by an employe to waive, release, or commute his rights to compensation, or any other rights under this act, shall be valid . . .". (43 P.S. §861).

The majority does cite the case of *Gianfelice Unempl. Compensation Case,* to which I have already referred, but either misapprehends it or arbitrarily refuses to be bound by it. Justice COHEN, speaking for the Court in that case, after outlining the processes of collective bargaining, said: "It would be anomalous to say that, in gaining this protection against his employer, an employee has lost a benefit which he otherwise would receive from the state—the right to receive unemployment benefits if dismissed—on the theory that he has voluntarily agreed to quit . . . *This is one reason why the collective bargaining agreement should not control in determining the eligibility of a retired employee for unemployment compensation."* (Emphasis supplied)

This Court in that case thus made it very clear that the collective bargaining agreement was not to be considered in determining whether or not the claimant's cessation of employment in accordance therewith was or was not voluntary. The determining factor was specifically pointed out to be *the factual situation at the time of cessation of employment.*

The majority opinion seeks to run the *Gianfelice* case onto a debating sidetrack by arguing that the facts there were different. There are not two cases in the millions of cases reported in the law books that are precisely similar in every single detail, but the principles involved can be similarized, and nothing that the majority says can wipe out what we said in *Gianfelice*, namely, that the criterion for determining the right to unemployment compensation is to be applied to the factual situation as it exists when the employee is separated from employment and not when he entered into a collective bargaining agreement.

If, in reaching its definitive decision, the majority had excluded the collective bargaining agreement, as it was required to do under §701 as quoted, it would be as clear as sunlight that the employee involved did not leave his employment voluntarily, since he *did* want to continue at his work.

The majority opinion states: "Employees who, on the basis of seniority, would ordinarily have the right to work as long as work existed, gave up that right and agreed that upon reaching the $5,000 wage mark, they would relinquish their positions to junior employees."

The employees relinquished their positions because they knew that there was not enough continuous work for everybody, themselves included. If they had not entered into the agreement specified, the company would have laid them off anyway. Because the employees agreed to do what was inevitable did not make separa-

tion from their jobs any the less involuntary. Advance knowledge of a disadvantage or misfortune does not import complicity in its occurrence. Everyone knows that he must one day die, but certainly he does not quit the earth any less involuntarily because of that fact, and especially if he knows the exact date.

The only reason why Lybarger was laid off on October 2, 1961, was that there was no work for him under the work schedule which was initiated, propounded, and executed by his employer. If there had been enough work to keep him employed after October 2, 1961, he would not have been laid off. Under the terms of the collective bargaining agreement he accepted what the company could have done unilaterally and probably would have done at the time if there had been no agreement. There just was not enough work for all employees, and Lybarger was inevitably bound to bear, at some time, the door of the mill clang shut behind him as he faced the bleak world of unemployment outside. Thus he should not be penalized because of the labor-management agreement which is not here a determining factor.

In *Gianfelice* this Court pointed out the anomaly of a situation which would allow compensation to a worker dismissed at the company's pleasure, absent a collective bargaining agreement, but would disallow it to an employee where there is a collective bargaining agreement even though separation from his job is not the result of any voluntariness on his part. The agreement in this case, in the phase here involved, was just as advantageous to the company as to the union. It assisted the company in distributing the work, since the company did not have full-time work for all its employees, and thus assured it of high grade skilled workers at all times. 90% of the collective bargaining agreements between unions and employers throughout the nation make seniority a determining feature in solving the problems which arise in lay-offs.

Under the rule announced by the majority the appalling situation results that the worker who is not a member of a labor union may receive unemployment benefits which would be denied to a labor union member. Such a discrimination, representing, as it does, a penalization against organized labor, is contrary to the public policy of the Commonwealth, and reflects on its Executive orders, legislative acts, and court decisions.

We said further in *Gianfelice*: "Support for the conclusion that a statutorily-expressed public policy cannot be modified by private agreement is readily found in analogous situations. In construing the federal 'Fair Labor Standards Act of 1938, as amended,' The United States Supreme Court has held that a labor-management agreement cannot be relied upon to bar a recovery of overtime pay." (p. 552)

One of the reasons given by the Superior Court for rejecting Lybarger's claim for compensation is that the separation from employment was only temporary "at best." The majority opinion does not discuss this "temporary" feature of the case, but since the majority affirms the Superior Court's decision, I want to make clear that I oppose not only the majority's reasoning here, but the reasoning, as well, of the Superior Court. How long a time is "temporary"? As against the scroll of the world's history, several centuries could be temporary; as against a man's entire lifetime, even a couple of years could be temporary; in a month's schedule a couple of days could be temporary; and, in the ephemeral life of a butterfly, a few seconds could count as temporary. It must be obvious that "temporary" is too flexible a word in meaning to become the keystone of the arch of economic stability in determining unemployment compensation.

In any event, is temporariness of unemployment a bar to compensation benefits? There is nothing in the Unemployment Compensation Law which indicates that

a temporary lay-off disqualifies an employee from compensation. In fact, there is language in the Act which excludes the interpretation drawn by the Superior Court: ". . . an employe who is unemployed during a plant shutdown for vacation purposes shall not be deemed ineligible for compensation merely by reason of the fact that he or his collective bargaining agents agreed to the vacation." (§4(u), 43 P.S. §753(u)).

In 1949 the Superior Court, in *Mattey Unempl. Comp. Case,* 164 Pa. Superior Ct. 36, held that the employee there involved was not entitled to unemployment compensation because of circumstances interplaying during an industry-wide shutdown for vacation as provided in the collective bargaining agreement between his union and the employer group. It was probably as the result of this decision that the Legislature amended the Act in 1955 in accordance with the wording above quoted. Commenting on this in *Piestrak Unempl. Compensation Case,* 404 Pa. 527, 533, Justice COHEN said: "Since the enactment of the 1955 amendment, an employee cannot be considered ineligible for benefits simply because the plant has shut down for a vacation period as agreed to by him or his union."

The Superior Court's rejection of compensation on the grounds of temporariness of layoffs was, therefore, invalid. All mankind will probably universally agree that nothing can be more temporary than a vacation, and, if compensation is authorized for unemployment due to shutdowns for vacation purposes, it may not be denied for the layoff "temporary" period indicated in the case at bar.

As I have already said, the major motif of the *Gianfelice* case is that compensation rights are determined according to the employment standing of the employee at the time he is separated from employment and not by his status at the time of the covering labor-management agreement. The majority opinion says that the

"involuntary" specified in the Act does not refer to "unemployment arranged, agreed upon, and sanctioned by the employer and employee but, rather to unemployment which is attendant upon the vicissitudes of the economic climate."

What was the economic climate when Lybarger was laid off? He wanted to work. When he was asked at the hearing, "If you had been offered full-time work would you have accepted it?" he replied: "I certainly would."

Even the employer's representative, Wm. F. McIntyre, testified that there was no work: "Q. And, therefore, when you indicated to the Bureau on Form UC-45 that was submitted to you you stated a layoff, is that correct? A. Yes, sir; for lack of work. Q. And that's all you said, 'Lack of work,' now is that true? A. Yes. If we had work in which to employ all of the people on the list, they would all be employed. . . . Q. Mr. McIntyre, if Talon, Incorporated, had had a greater amount of work for these chain machine operators is it true that these 37 would not have been laid off? A. Yes, it is."

The majority opinion says that "re-employment was not only certain in this case, but guaranteed by contract on a regular, scheduled basis." Does the majority intend to convey the idea that if Lybarger was not re-employed on the following January 1st, he could hold the employer liable for the wages he would have received if he had worked? Of course, the majority would not subscribe to that inevitable conclusion, yet it advances the premise of a "guaranteed" re-employment. In this respect, it absolutely ignores the record. The re-employment of Lybarger and his co-workers depended entirely on the turning of the hinges of economic fate.

The employer's representative was asked: "If Talon, Incorporated, on January 1, had had a lesser amount

of work than it actually did, is it a fact that the 37 or a portion of them would not have been recalled?" His reply was: "They would not have been recalled."

Thus, Lybarger was compelled to leave when he wanted to work and, while the labor-management agreement provided he would be re-employed on January 1, 1962, he still might not have had access to his tool box at the termination of the "temporary" layoff, if work conditions did not so permit.

The decision of the majority in this case has, I fear, complicated and confused a very simple situation and may have placed an obstacle in the path of progress of the humanitarian objectives so properly embodied in the Unemployment Compensation Act.

I dissent.

---

DISSENTING OPINION BY MR. JUSTICE COHEN:

In *Gianfelice Unemployment Compensation Case*, 396 Pa. 545, 153 A. 2d 906 (1959) we said: "[T]he collective bargaining agreement should not control in determining the eligibility of a retired employee for unemployment compensation; *rather, the factual matrix at the time of separation should govern*". (Emphasis in the original.)

We gave two specific reasons for outlawing consideration of the collective bargaining agreement in determining whether termination of employment was voluntary: (1) "The pressures of the collective bargaining process are too complex to permit this over-simplified theory to govern a determination here. They would require an inquiry into each case to determine the position of each side at the bargaining table, and even then a clearcut answer would undoubtedly not be forthcoming." (2) "The Unemployment Compensation Law was enacted to alleviate the hardships attendant upon unemployment. . . . It is a remedial statute designed to

provide support for workers who are unemployed except for those disqualified by one of the specific provisions of §402. . . . In furtherance of this policy, the General Assembly included §701, 43 P.S. §861, in the law. This provision renders invalid any agreement by an employee to waive or release any of his rights under the act. It is our view that if the labor-management agreement were able to be relied upon to disqualify Gianfelice as a 'voluntary quit' when his separation from work was not in fact voluntary, the agreement would be invalid to such extent."

Moreover, in the context of unemployment compensation when the voluntariness of termination is at issue, we expressly rejected the materiality of the theory "that a union member is bound by his union's actions in negotiating a collective bargaining agreement with the employer". We said: "The major premise of the Superior Court that an employee is bound by his union's agreement with his employer as expressed in a collective bargaining agreement is unexceptionable on its face. However, in the present context the Superior Court has used this premise to disqualify persons for benefits under the Unemployment Compensation Law who otherwise would be eligible. We do not believe that this result is correct."

Thus, it would seem that our statutory interpretation of the word "voluntary" in *Gianfelice,* as being confined to the moment of termination unaffected by any prior agreement, an interpretation supported by extensive reasons and analogies, an interpretation enunciated in broad and clear terms—necessarily controls the instant case. Further, it would seem that the statutory interpretation enunciated in *Gianfelice* is not open to reconsideration by this Court—not merely because it is recently enunciated, good law, supported by reasons of continuing applicability, but also because

no less than three times[1] since *Gianfelice* was decided the Legislature has addressed itself to and made substantive changes in the eligibility and ineligibility provisions[2] of the Unemployment Compensation Law without changing the interpretative rule of *Gianfelice.* In *Scipani v. Pressed Steel Car Co.,* 150 Pa. Superior Ct. 410, 28 A. 2d 502 (1942), the Superior Court interpreted the clause of the Workmen's Compensation Act defining "earning power". Ten years later, in *Liberatori v. Scott Smith Cadillac Company,* 172 Pa. Superior Ct. 121, 92 A. 2d 557 (1952), an employee sought a change of the *Scipani* interpretation. Judge RENO responded for the Court: "The Scipani decision was rendered in 1942, and during the ensuing decade the General Assembly has twice amended §306(b). . . . Neither amendment touched the clause [interpreted in Scipani]. . . . The Scipani case is the settled law of the Commonwealth. It has acquired the virtual force of a legislative enactment. When the 1945 and 1949 legislatures amended §306(b) without touching the foundation of the Scipani case they, in effect, reenacted the quoted clause and the interpretation placed upon it by this Court. Statutory Construction Act of May 28, 1937, P. L. 1019, §§52(4), 73, 46 P.S. §§552[4], 573. . . . 'The question whether another formula would achieve a fairer or more just result than the one prescribed under §306(b) of the 1939 amendment is a matter for the legislature to determine and is not within the province of this Court.'" This time-honored principle of the effect of judicial statutory interpretation followed by the failure of the Legislature to change the interpretation while making substantive changes

---

[1] Act of December 17, 1959, P. L. 1893, §7; Act of September 14, 1961, P. L. 1301, §3; Act of March 24, 1964, P. L. 53, §5 (Special Session).

[2] Act of December 5, 1936, P. L. (1937) 2897, §§401, 402, 43 P.S. §§801, 802.

in other parts of the interpreted provisions—a principle which is codified in the Statutory Construction Act—could have no greater validity than in this case. One need only look at the list of counsel who appeared before this Court in *Gianfelice* in order to realize that it was one of the most important cases in the law of unemployment compensation, that the rule enunciated therein received tremendous publicity, and that no Legislature which thereafter addressed itself to the eligibility and ineligibility clauses of the Act could fail to have in mind the *Gianfelice* rule. When one adds to this the tremendous pressure that always obtains when important changes are made in workmen's and unemployment compensation acts one cannot doubt that the statutory rule of statutory construction set forth above has its surest applicability in this case.

Accordingly, I am deeply disturbed by the majority disposal of *Gianfelice* on the ground that "the Court's decision carefully and wisely limited the language in the case to its facts". One need only read *Gianfelice* casually to recognize that the decision therein is not limited to its facts. The sweep of the rule and the reasons for it quoted at the outset are evident. Moreover, this Court applied the rule to *Smith Unemployment Compensation Case,* 396 Pa. 557, 154 A. 2d 492 (1959), where *the facts were very different* but, nevertheless, on the basis of *Gianfelice,* the collective bargaining agreement was deemed irrelevant in deciding whether termination of employment was "voluntary". In my opinion, the majority is, sub silentio, reversing the rule of *Gianfelice,* at least for this case, and is doing so in contravention to the legislative intention as derived from obviously applicable statutory rules of statutory construction. All the major steps taken in the majority opinion are wrong under *Gianfelice*: (1) The majority ignores the factual matrix found by the Board to exist at the time of termination of employ-

ment for the purpose of determining whether that termination was voluntary, (2) looks to the collective bargaining agreement to determine whether termination of employment was voluntary, and (3) deems the union-employee agency relationship, with respect to bargaining, material in deciding voluntariness.[3]

I hesitate to respond directly to the majority's reasons for ignoring *Gianfelice* and the Legislature's intention because I believe history demonstrates that courts are weakest when they interject their own economic theories into the law. This is true because the judges' personal theories are irrelevant and because judges are not often good economists. Nevertheless, I find it necessary to respond because the majority opinion does not even pretend to derive validity from our prior case law as approved by the Legislature but rests solely upon its own economic theory. In short, the majority's theory is that the union and the employer have *created unemployment by contract where unemployment would not otherwise exist* and have thereby committed a fraud upon the unemployment compensation fund. The majority states absolutely no facts upon which this theory is based. All that is cited is the contract, but the contract does not disclose what the unemployment rate would be if the contract did not exist. The fact that *does* clearly appear of record as being found by the Board is *ignored* by the majority, namely, that the unemployed persons involved in this case were "available for suitable work" but unable to obtain it.

---

[3] To support this proposition the majority cites, in its footnote 7, *Mattey Unemployment Compensation Case*, 164 Pa. Superior Ct. 36, 63 A. 2d 429 (1949) and *Pusa Unemployment Compensation Case*, 178 Pa. Superior Ct. 348, 115 A. 2d 791 (1955) which followed the theory of *Mattey*. Not only was the agency theory held immaterial in *Gianfelice* but also the application of the theory in *Mattey* was expressly overruled by the Legislature in a 1955 amendment. See *Piestrak Unemployment Compensation Case*, 404 Pa. 527, 532-534, 172 A. 2d 807 (1961).

Regrettably, the only way to respond to an economic theory which is unsupported by record facts is to suggest another theory which is a more plausible explanation of the terms of the contract—a contract, which, under *Gianfelice,* the majority should never have considered in the first place. The employer could only use a certain number of employees in his business. The number of persons *available and unemployed* who could perform the job was greater than the number the employer could use. In order to give more persons an opportunity to work during the year no person was allowed to work after his earnings reached $5,000. In other words, the employer and union agreed to "spread the work". In the anthracite coal industry the work is spread on a time, rather than dollar, basis, the employees working alternate months. In other industries the retirement age is set with an eye to making room for new employees as well as an eye toward the age at which an employee loses his effectiveness. (None of these provisions for "spreading the work" involve "featherbedding" which is having more men employed at any one time than are needed to do the job.) "Spreading the work" in no way *creates* unemployment. Viewed in terms of unemployed man hours it neither increases nor decreases unemployment. All it does is to allow more persons to work over a period of time. Rather than having 50 men continuously employed and 50 men continuously unemployed all 100 men work part of the time and are unemployed part of the time.

Far from attributing to the employees some sort of "fault", as the majority does, it seems commendable that more people are given a chance to work in a society which values work as highly as ours does. Surely the majority does not believe it is the employee's "fault" that all the available man hours cannot be absorbed by the economy. What the majority fails to recognize is that the "spread the work" doctrine is an

attempt to cope with the sad fact of unemployed man hours—a fact not attributable to any "fault" on the part of the employees.

If 100 men who are employed part of the time and unemployed the other part of the time place more of a strain on the unemployment compensation fund than 50 men who are employed continuously and 50 men who are unemployed continuously and the Legislature thinks the strain is too great, then the Legislature must change the law. But, as it now stands, the law merely requires that the employee who was "layed off" desired, *at the time of the layoff,* to continue working and that he be available for suitable work but unable to obtain it. The Board found these factual requirements to exist in this case. "[T]he findings of the Board of Review as to facts, if supported by the evidence, are conclusive. . . . Here the Board made findings of fact, stated above, which the Superior Court has disregarded despite the fact that the findings are well supported by the evidence contained in the record. The appellate courts do not exist to retry factual matters better left to determination by the administrative agencies charged with hearing the cases, and we should not begin to alter this approach now. The Board, moreover, correctly applied the law to these facts and found claimants eligible." *Progress Manufacturing Company, Inc. v. Unemployment Compensation Board of Review,* 406 Pa. 163, 176 A. 2d 632 (1962).

I dissent.