858 A.2d 91

UNITED STATES STEEL CORPORATION
(USX CLAIRTON WORKS)

v.

UNEMPLOYMENT COMPENSATION BOARD OF REVIEW

Appeal of Wayne R. Wilson.

United States Steel Corporation (USX Clairton Works)

v.

Unemployment Compensation Board of Review

Appeal of John H. Brilhart.

United States Steel Corporation (USX Clairton Works)

v.

Unemployment Compensation Board of Review

Appeal of Gary S. Kukler.

United States Steel Corporation (USX Clairton Works)

v.

Unemployment Compensation Board of Review

Appeal of Stephen A. Williams.

United States Steel Corporation (USX Clairton Works)

v.

Unemployment Compensation Board of Review

Appeal of Charles L. Gourn.

United States Steel Corporation (USX Clairton Works)

v.

Unemployment Compensation Board of Review

Appeal of Robert J. Colabianchi.

United States Steel Corporation (USX Clairton Works)

v.

Unemployment Compensation Board of Review

Appeal of Daniel J. Koon.

United States Steel Corporation (USX Clairton Works)

619

v.

Unemployment Compensation Board of Review

Appeal of John P. Kisielnicki.

United States Steel Corporation (USX Clairton Works)

v.

Unemployment Compensation Board of Review

Appeal of Leroy J. Davis.

United States Steel Corporation (USX Clairton Works)

v.

Unemployment Compensation Board of Review

Appeal of Richard W. Hannegan.

United States Steel Corporation (USX Clairton Works)

v.

Unemployment Compensation Board of Review

Appeal of Leonard C. Stokes.

United States Steel Corporation (USX Clairton Works)

v.

Unemployment Compensation Board of Review

Appeal of Jay P. Graft.

United States Steel Corporation (USX Clairton Works)

v.

Unemployment Compensation Board of Review

Appeal of James Grajcar.

United States Steel Corporation (USX Clairton Works)

v.

Unemployment Compensation Board of Review

Appeal of Richard J. Hough.

United States Steel Corporation (USX Clairton Works)

v.

Unemployment Compensation Board of Review

Appeal of William C. Stoffel.

United States Steel Corporation (USX Clairton Works)

v.

Unemployment Compensation Board of Review

Appeal of Thomas J. Norman.

United States Steel Corporation (USX Clairton Works)

v.

Unemployment Compensation Board of Review

Appeal of Anton J. Kotar.

United States Steel Corporation (USX Clairton Works)

v.

Unemployment Compensation Board of Review

Appeal of Danny J. Jancuski.

United States Steel Corporation (USX Clairton Works)

v.

Unemployment Compensation Board of Review

Appeal of Samuel L. Fonner.

United States Steel Corporation (USX Clairton Works)

v.

Unemployment Compensation Board of Review

Appeal of Gary L. Fine.

United States Steel Corporation (USX Clairton Works)

v.

Unemployment Compensation Board of Review

Appeal of Joseph A. Jenco.

Supreme Court of Pennsylvania.

Argued March 3, 2004.

Decided Sept. 22, 2004.

622

John Edward Stember, Pittsburgh, for Appellants.

Richard Eloit Gordon, Pittsburgh, for Appellant Amicus Curiae, United Steel Workers of America.

Clifford F. Blaze, Maribeth Wilt-Seibert, Harrisburg, for Appellee, Unemployment Compensation Bd. of Review.

Michael Patrick Duff, Pittsburgh, for Appellee, United States Steel Corp.

Before: CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## *OPINION*

Justice SAYLOR.

The central issue in these consolidated appeals by allowance is whether the relinquishment, during collective bargaining, of a scheduled, future salary increase for employees, in return for a lump-sum payment by the employer into a pension fund for current and future retirees, constitutes an employee "contribution" to such fund for purposes of Pennsylvania's unemployment compensation statute and applicable federal law.

United States Steel Corporation ("Employer") contributes to, and maintains, the Carnegie Pension Plan (the "Plan") for retired employees. Employer's contributions to the Plan have been governed by the terms of various agreements that have been executed by Employer and the United Steelworkers of America (the "Union"). The first such agreement relevant to the present matter was executed by the parties in 1977, and was set to expire on July 31, 1980. Under this contract, employees were scheduled to receive a cost-of-living adjustment ("COLA") in May of 1980. In early 1980, however, before the 1977 agreement expired and before the COLA took

effect, Employer and the Union negotiated a second contract, dated April 15, 1980, that succeeded the 1977 contract. During the negotiations that preceded execution of the 1980 agreement, one important issue that concerned the parties pertained to the enhancement of pension funding. This issue was ultimately resolved when the Union agreed to relinquish the COLA that was scheduled to begin in May, and Employer agreed to provide a modest general pay increase and, additionally, make a lump-sum contribution to the pension fund. Thereafter, retirees and future retirees became eligible for increased pension benefits due, at least in part, to this lump-sum payment. The payment was placed directly into the general pension fund administered under the Plan; no special fund or account was created for the disbursement of these monies.

Appellant Wayne R. Wilson ("Claimant") worked for Employer in May of 1980, and thus, he would have been eligible for the COLA scheduled under the superseded 1977 contract.[1] In July of 2001, Claimant filed for unemployment compensation benefits and established financial eligibility based upon wages paid by Employer. Claimant initially received full unemployment benefits, reduced only by part-time wages. He also received monthly retirement pension disbursements under the Plan in the amount of $1,830.00. The local office of employment security (the "Job Center") ultimately reduced Claimant's weekly benefit by $212.00, a sum representing one half of the weekly prorated amount of Claimant's pension receipts.[2] This reduction was effected pursuant to Section 404(d)(2) of the Unemployment Compensation Law,[3] 43 P.S. § 804(d)(2), which provides, in relevant part:

(i) ... for any week with respect to which an individual is receiving a pension ... under a plan maintained or contrib-

1. Wilson has been selected as the lead claimant for the other appellants, who are similarly situated.

2. The proper disposition of any excess monies that Claimant may have received prior to this reduction of benefits is not at issue in this case.

3. Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897 (as amended, 43 P.S. §§ 751–914) (the "Law").

uted to by a base period or chargeable employer, the weekly benefit amount payable to such individual for such week shall be reduced, but not below zero, by the pro-rated weekly amount of the pension as determined under sub-clause (ii).

(ii) If the pension is entirely contributed to by the employer, then one hundred per centum (100%) of the pro-rated weekly amount of the pension shall be deducted. If the pension is contributed to by the individual, in any amount, then fifty per centum (50%) of the pro-rated weekly amount of the pension shall be deducted.

43 P.S. § 804(d)(2)(i), (ii).[4] Hence, the decision to reduce Claimant's benefits by only 50 percent of his pension receipts, rather than utilizing a dollar-for-dollar offset, necessarily reflected the position that Claimant had contributed, in some amount, to the pension fund while working for Employer.

Employer contested the 50 percent offset, and a hearing was held before an unemployment compensation referee, where the primary question focused upon whether Claimant had, indeed, made any contributions to the pension fund. Although it was undisputed that Claimant had not directly deposited money into the fund, Claimant argued that Employer's payment of the lump-sum monies pursuant to the 1980 agreement constituted an indirect employee contribution, inasmuch as the employees involved (including Claimant) had relinquished their scheduled COLA in return for such payment. Employer, on the other hand, asserted that, as all payments into the fund had been made solely by Employer, the employees did not make any contributions for purposes of Section 404(d)(2)(ii) of the Law, and hence, the Job Center

4. These provisions are only applicable if the retiree is "eligible" for unemployment compensation in the first instance. 43 P.S. § 804. *See generally Warner Co. v. UCBR (Gianfelice)*, 396 Pa. 545, 552, 153 A.2d 906, 910 (1959) (finding a retiree eligible where his retirement was involuntary). The question of whether the present appellants were properly deemed eligible for unemployment benefits is not before this Court, however, as Employer did not contest their eligibility before the referee or the Board. *See Wing v. UCBR*, 496 Pa. 113, 117, 436 A.2d 179, 180 (1981).

should have applied a dollar-for-dollar offset against Claimant's unemployment benefits.

The referee agreed with Claimant, and determined that the bargained-for lump-sum payment by Employer constituted an employee contribution. In reaching this conclusion, he considered the matter to be governed by the Commonwealth Court's then recent decision in *Ehman v. UCBR,* 776 A.2d 1031 (Pa.Cmwlth.2001), which involved similar facts: there, the employees had agreed to relinquish a COLA that they had already begun receiving, and the employer utilized the funds derived from this COLA "give-back" to augment pension benefits. The *Ehman* court held that, under these circumstances, the employees had, in effect, funded enhanced pension benefits through a reallocation of monies from their future paychecks, with the employer acting only as a conduit for this process; the court stated that such arrangement was unusual and was qualitatively different from "swapping inchoate proposals during bargaining." *Id.* at 1036. Although the foregone salary increase in the present case was contained in the superseded agreement, and had not yet taken effect, the referee nonetheless concluded that *Ehman* could not be distinguished on its facts, and accordingly, upheld the 50 percent offset. The Unemployment Compensation Board of Review (the "Board") summarily affirmed.[5]

■ The Commonwealth Court reversed the Board, overruling *Ehman* in the process. *See United States Steel Corp. (USX Clairton Works) v. UCBR,* 817 A.2d 1251 (Pa.Cmwlth. 2003) (*en banc*). Initially, the court reviewed the complex history of the labor negotiations in this case, and also referenced the primary purpose of the Law's offset provision, namely, to eliminate payment of duplicative, windfall benefits, and thereby to preserve unemployment benefits for individuals who need them most. *See id.* at 1260 (citing *Attenberger v. UCBR,* 682 A.2d 68 (Pa.Cmwlth.1996); *Latella v. UCBR,* 74 Pa.Cmwlth. 14, 459 A.2d 464 (1983); *Novak v. UCBR,* 73

---

5. The Board issued similar orders in all of the matters presently under consideration, which were consolidated on appeal to the Commonwealth Court.

Pa.Cmwlth. 148, 457 A.2d 610 (1983)). The court then cited to decisions from other jurisdictions in which a direct contribution from the employee has been deemed necessary for anything less than a full offset of pension benefits. *See id.* at 1261–62 (citing *Cardarelli v. Department of Employment and Training, Bd. of Review,* 674 A.2d 398 (R.I.1996); *Belmont v. State, Dep't of Labor,* 745 P.2d 75 (Alaska 1987)). The court stated:

> Based upon review of the statutory framework, caselaw from other jurisdictions, as well as the record in the case *sub judice,* it is now apparent that the difficulties of proof in allowing pension offset decisions to be guided by collective bargaining negotiations renders the *Ehman* doctrine unworkable from a practical standpoint.

*Id.* at 1262. Referencing the need for prompt resolution of unemployment compensation claims, as well as the problems of adducing historical evidence regarding the intent and purpose of collective bargaining agreements, the Commonwealth Court ultimately held that, under Section 404(d)(2)(ii), 43 P.S. § 804(d)(2)(ii), a 50 percent pension offset may only obtain where there is either a line-item deduction on the employee's pay stub reflecting the employee's contribution, or a specific provision in the pension plan indicating that the employee has made a contribution to the pension fund. *See id.* at 1264. As these conditions were not met here, the court determined that the Law required a 100 percent offset from Claimant's benefits. *See id.*

President Judge Colins issued a brief dissenting opinion, joined by Judge Smith–Ribner, in which he referred to the steelworkers having waived their scheduled COLA in exchange for a wage increase and a lump-sum payment into their pension fund. He stated, "[f]orbearance equals consideration; therefore, the employees contributed to the pension plan within the meaning of Section 404(d)(2) of the law." He thus indicated that the referee had properly applied *Ehman. See id.* at 1265 (Colins, P.J., dissenting).

■ Before setting forth the parties' respective positions, it is helpful to review some background information concerning the applicable legal authority. Unemployment compensation has been a joint federal-state undertaking ever since Congress passed the Social Security Act of 1935.[6] *See generally Charles C. Steward Mach. Co. v. Davis,* 301 U.S. 548, 574–78, 57 S.Ct. 883, 884–87, 81 L.Ed. 1279 (1937) (discussing the statutory mechanism underlying the unemployment insurance program); *Bliley Elec. Co. v. UCBR (Sturdevant),* 158 Pa.Super. 548, 553–54, 45 A.2d 898, 901–02 (1946) (describing the history of unemployment compensation systems in England and the United States); PA. JUR.2D *Unemployment Compensation* § 4:17 (1994). This joint program involves the interaction of state laws with several federal enactments, including the Social Security Act and the Federal Unemployment Tax Act ("FUTA").[7] Under this scheme, states reap substantial benefits so long as their unemployment laws remain in compliance with federal requirements, as attested by the United States Secretary of Labor. Thus, primarily, Section 303(a) of the Social Security Act, 42 U.S.C. § 503(a), sets forth a number of conditions that state laws must meet in order to receive federal approval. Upon determining that a state's laws and practices satisfy these requirements, the Secretary of Labor "certifies" the state enactment, thereby making the state eligible to be reimbursed out of the federal treasury for the cost of administering its unemployment compensation system. *See* 42 U.S.C. § 503(a); *Fusari v. Steinberg,* 419 U.S. 379, 382 n. 4, 95 S.Ct. 533, 536 n. 4, 42 L.Ed.2d 521 (1975).

FUTA embodies another aspect of the cooperative federal-state program. Pursuant to that statute, employers pay federal unemployment taxes on wages paid. If the laws of a state comply with the minimum standards established under FUTA (in addition to the Social Security Act), employer-taxpayers in that state receive credit against their federal tax liability for

6. Act of August 14, 1935, c. 531, 49 Stat. 620 (as amended, 42 U.S.C. §§ 301–1397jj).

7. Act of August 16, 1954, c. 736, 68A Stat. 439 (as amended, 26 U.S.C. §§ 3301–3311).

any monies they pay into the state's unemployment fund. *See* 26 U.S.C. § 3302.

From time to time, the Department of Labor issues so-called "Program Letters" to inform the states of its interpretation of controlling federal law, including FUTA and the Social Security Act. These letters play an important role in maintaining federal certification for a given state. Thus, as one federal appellate court has explained:

Each year the Secretary of Labor examines the laws of each state and certifies those states which comply with the minimum federal standards. The Department of Labor informs state agencies of the minimum federal requirements they must meet to remain certified primarily by issuing Unemployment Insurance Program Letters. In determining whether a state's unemployment compensation system is in compliance with federal standards, the Secretary of Labor relies on the positions he has taken in the letters. A state which is not in compliance can be decertified....

*Cabais v. Egger*, 690 F.2d 234, 236 (D.C.Cir.1982) (footnote omitted).

▓ Notwithstanding the various standards that a state law must meet for certification, Congress has generally "afforded great discretion to the states in the design and operation of their unemployment insurance programs." *Watkins v. Cantrell*, 736 F.2d 933, 937 (4th Cir.1984). As of 1976, however, it became apparent that some states were allowing retired persons who received social security or pension benefits to obtain unemployment compensation concurrently, although they were no longer attached to the work force. Therefore, Congress added to FUTA a provision requiring, as a condition of certification, that the state law ameliorate this practice by offsetting an individual's unemployment benefits by the amount of any public or private pension, or similar periodic retirement payment, received by the individual. *See* 26 U.S.C. § 3304(a)(15). Indeed, notwithstanding the "broad freedom" that states retain in establishing their unemployment compensation systems, *New York Tel. Co. v. New York State Dep't of Labor*, 440 U.S. 519, 537, 99 S.Ct. 1328, 1339, 59 L.Ed.2d 553

(1979), this pension offset requirement has been deemed one of a limited number of "fundamental standards" that must be met for a state to receive the benefits of federal certification. *See Watkins,* 736 F.2d at 937 (citing, *inter alia, Brown v. Porcher,* 660 F.2d 1001, 1004 (4th Cir.1981); *McKay v. Horn,* 529 F.Supp. 847, 850 n. 4 (D.N.J.1981); H.R.Rep. No. 1343, Conf. Rep. on H.R. 3904, 96th Cong.2d Sess., U.S.Code Cong. & Admin.News 1978, 2918).

The pension offset mandated by the federal statute applies only if "such pension, retirement or retired pay, annuity, or similar payment is under a plan maintained (or contributed to) by a base period employer or chargeable employer (as determined under applicable law)." 26 U.S.C. § 3304(a)(15)(A)(i). Originally, the statute mandated a dollar-for-dollar offset of pension benefits against unemployment benefits in all cases. In 1980, however, Congress relaxed this requirement to permit states to reduce the offset to take into account contributions that the individual employee made to the pension plan. *See* 26 U.S.C. § 3304(a)(15)(B).[8] In accordance with these

---

8. Thus, Section (a)(15) now states:

(a) **Requirements.**—The Secretary of Labor shall approve any State law submitted to him, within 30 days of such submission, which he finds provides that—

\* \* \* \* \*

(15) the amount of compensation payable to an individual for any week which begins after March 31, 1980, and which begins in a period with respect to which such individual is receiving a governmental or other pension, retirement or retired pay, annuity, or any other similar periodic payment which is based on the previous work of such individual shall be reduced (but not below zero) by an amount equal to the amount of such pension, retirement or retired pay, annuity, or other payment, which is reasonably attributable to such week except that—

(A) the requirements of this paragraph shall apply to any pension, retirement or retired pay, annuity, or other similar periodic payment only if—

(i) such pension, retirement or retired pay, annuity, or similar payment is under a plan maintained (or contributed to) by a base period employer or chargeable employer (as determined under applicable law), and

(ii) in the case of such a payment not made under the Social Security Act or the Railroad Retirement Act of 1974 (or the corresponding provisions of prior law), services performed for such employer by the individual after the beginning of the base period (or

provisions, the Pennsylvania General Assembly enacted Section 404(d)(2) of the Law, 43 P.S. § 804(d)(2); in 1988, Section 404(d)(2) was amended to its present form, set forth in relevant part above.

■ Presently, the parties do not dispute that the pension at issue is maintained by a base period or chargeable employer. Rather, as previously stated, the controversy centers on whether the COLA give-back constitutes a "contribution" pursuant to state and federal law.[9] The Board found that it did.[10] We must affirm this adjudication unless we determine that: it violates the appellant's constitution rights; it is not in accordance with law; it was reached in violation of applicable administrative procedure; or any fact necessary to the decision is not supported by substantial evidence. *See* 2 Pa.C.S. § 704; *Grieb v. UCBR,* 573 Pa. 594, 599, 827 A.2d 422, 425 (2003). As the issue for review is one of statutory interpretation, it is a question of law subject to plenary review by this Court. *See Navickas v. UCBR,* 567 Pa. 298, 303, 787 A.2d 284, 288 (2001).

Presently, Claimant argues that the bargain reached by Employer and the Union resulted in an employee contribution because, pursuant to the 1980 agreement, he relinquished a contractually-guaranteed COLA in return for Employer's payment of the agreed sum into the pension plan. In this regard, he asserts that the COLA give-back was an indirect contribu-

remuneration for such services) affect eligibility for, or increase the amount of, such pension, retirement or retired pay, annuity, or similar payment, and

(B) the State law may provide for limitations on the amount of any such a reduction to take into account contributions made by the individual for the pension, retirement or retired pay, annuity, or other similar periodic payment[.]

26 U.S.C. § 3304(a)(15).

9. As discussed more fully *infra,* the proper construction of federal law is relevant here because the present version of Section 404(d)(2)(ii) was passed in order to comply with Congressional mandates.

10. The Board asserts that it considered itself bound by *Ehman* in its orders, but argued on appeal that the Commonwealth Court should overrule *Ehman,* which it considers to have been wrongly decided. *See* Brief for Appellee (Board) at 8–9.

tion, and emphasizes that, as in *Ehman*, this exchange was qualitatively different from the "swapping of inchoate proposals during bargaining." Claimant urges, further, that the Law should generally be broadly construed to achieve its remedial purposes, and that a liberal construction is particularly appropriate in this instance because the 50 percent reduction of the offset applies so long as the employee contributed "in any amount." In further support of this interpretation, Claimant points to cases in which this Court has applied a broad construction to the Law's benefit-eligibility requirements. *See, e.g., Navickas v. UCBR*, 567 Pa. 298, 787 A.2d 284 (2001); *Lopata v. UCBR*, 507 Pa. 570, 493 A.2d 657 (1985); *Penn Hills Sch. Dist. v. UCBR*, 496 Pa. 620, 437 A.2d 1213 (1981). The Union, as *amicus curiae*, adds that the Commonwealth Court usurped the legislative role by crafting specific criteria to define when an employee should be deemed to have contributed to a pension plan. It also suggests that that court should not have relied upon decisions from other states, as FUTA leaves each state free to define what constitutes a contribution under its own legislation.

Employer responds that the general rule of broad construction is inapplicable in the present case, because the single statutory term under review—contribute—has a specific, technical meaning under the Internal Revenue Code (IRC) of which FUTA is part. Specifically, Employer suggests that non-contributory pension plans (those funded solely by an employer) carry substantial tax benefits for employees as compared to contributory plans (those to which employees make after-tax contributions), *see generally Howell v. United States*, 775 F.2d 887, 887 (7th Cir.1985) (explaining the tax advantages of non-contributory pension plans),[11] and that this may be one reason that the Union favored having Employer maintain the Plan as a non-contributory one.[12] Employer

11. In *Howell*, the court pointed out that employers are generally indifferent between the two options of contributing to a pension fund on behalf of employees, versus paying a higher salary, some of which flows into the fund, as the amount ultimately placed in the fund constitutes a tax-deductible business expense in either case. *See id.*

12. The dissent does not discuss this possibility and maintains instead that the employees wished to contribute to the pension fund directly,

states that this technical understanding of an employee "contribution" was never challenged during decades of unemployment compensation practice until *Ehman,* and that the court in that case erroneously deviated from the common understanding of what it means for an employee to contribute to a pension fund. For its part, the Board avers that the Commonwealth Court's present holding comports with the plain meaning of the statutory text, and additionally expands upon that court's conclusion that the *Ehman* rule is unworkable:

> To treat the wage concession as an employee contribution would create a nebulous and potentially inequitable test for pension offsets. In almost all wage negotiations, there are trade-offs between cash wages and fringe benefits. [Thus,] the funding of any pension plan necessarily diminishes employer resources from which higher cash wages could be paid. In theory, almost every pension recipient can argue that they [sic] would have received higher cash wages, if not for the employer's agreement to fund their pension.

Brief for Appellee (Board) at 12.

Claimant's arguments are not entirely untenable. He did forego a COLA that was contractually guaranteed, rather than merely inchoate, in exchange for the Employer's payment of a sum certain into the Plan. In an indirect sense, then, he can be seen to have "contributed" to the Plan. Ultimately, however, we find Appellees' contentions more persuasive. Under a plain meaning analysis, the statutory term contemplates a direct, out-of-pocket contribution;[13] in this regard, the Board's concerns about line-drawing if we were to overlay the meaning of "contribute" with ascending levels of indirectness are well founded. Here, although the COLA

but were legally precluded from doing so. *See* Dissenting Opinion, 579 Pa. at 641–44, 858 A.2d at 106, 107. There is nothing in the record, however, to indicate that the employees wished to make direct contributions, or to suggest that, during collective bargaining, the parties could not have agreed to establish a contributory pension plan (or supplemental plan) so that the employees could forward their COLA monies directly into the pension fund.

13. The Law and FUTA both define "contribution," but these definitions pertain to deposits into an unemployment compensation fund, not into a pension plan. *See* 43 P.S. § 753(g); 26 U.S.C. § 3306(g).

give-back ultimately formed the basis upon which Employer agreed to make a lump-sum payment, it is uncontested that Claimant did not make any out-of-pocket monetary contributions to the Plan. Further, Employer was not a mere conduit through which a portion of the employees' salary flowed into the Plan: the prospective COLA funds were entirely foregone, and the agreement reached did not contemplate that those specific monies were to be deposited into the Plan.[14] We therefore find that an employee "contribution," as contemplated under Section 404(d)(2)(ii), 43 P.S. § 804(d)(2), does not encompass an employer contribution made in return for a COLA give-back, such as occurred here.

Contrary to Claimant's suggestion, moreover, this understanding of the statutory text is not inconsistent with this Court's prior decisions in which the Law's *eligibility* requirements have been interpreted broadly (through a strict construction of eligibility exclusions) to support the statute's remedial purpose. Thus, for example, the Court has: determined that a school bus driver who lost several non-consecutive days of work due to snow-related school closures was eligible for compensation because the Law did not specifically preclude benefits in that situation, *see Penn Hills*, 496 Pa. at 626, 437 A.2d at 1216; broadly defined and applied the term "credit week" as a condition of eligibility, *see Lopata*, 507 Pa.

---

**14.** The dissent supports its position that Employer was, in fact, simply a conduit for the waived COLA monies by asserting that the lump-sum contribution was "substantially similar, if not identical" to the amount of the COLA wages foregone. Dissenting Opinion, at 641–43, 858 A.2d at 106. However, the record contains no indication of the size of Employer's lump-sum contribution as compared to the monetary value of the waived COLA wages. Indeed, during bargaining the parties could not have known the cumulative value of such wages, as that sum would depend upon unknown future events, such as plant closings and openings, and employee hirings, resignations, terminations, retirements, and deaths. Thus, if the parties had wished Employer to be a mere conduit, they would have agreed to a scheme of continuing, smaller contributions in the amount of the foregone COLA wages. Additionally, although the COLA waiver can be seen as supplying consideration for Employer's lump-sum payment, as the dissent emphasizes, *see id.* at 640–43, 858 A.2d at 105–06, and as recognized above, the legal standard established by the General Assembly is not consideration, but contribution. *See* 43 P.S. § 804(d)(2).

at 576–79, 493 A.2d at 661–62; and refused to interpret the benefit-disqualifying "willful misconduct" standard to encompass ordinary negligence, see *Navickas*, 567 Pa. at 308–09, 787 A.2d at 291; *Myers v. UCBR*, 533 Pa. 373, 381, 625 A.2d 622, 627 (1993); *Grieb*, 573 Pa. at 602–03, 827 A.2d at 427. An important motivating principle underlying all of these decisions is that the Law was intended to address the problem of indigency which can result from the sudden loss of employment, and should be liberally construed in keeping with that policy. See generally 43 P.S. § 752 (setting forth the General Assembly's declaration of legislative policy); *Penn Hills*, 496 Pa. at 624, 437 A.2d at 1215 (stressing that the legislative policy declaration is a substantive aid to interpreting the Law's individual provisions).[15]

Here, however, broadly interpreting employee contributions under Section 404(d)(2)(ii) would not have a similar effect, as it would only increase the size of payments provided to already-eligible individuals who are receiving additional financial support from an independent source, rather than enlarging the set of out-of-work persons considered eligible for compensation in the first instance. See *Penn Hills*, 496 Pa. at 625, 437 A.2d at 1215–16 (clarifying that the rule of liberal interpreta-

15. Section 752 states:
Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of the Commonwealth. Involuntary unemployment and its resulting burden of indigency falls with crushing force upon the unemployed worker, and ultimately upon the Commonwealth and its political subdivisions in the form of poor relief assistance. Security against unemployment and the spread of indigency can best be provided by the systematic setting aside of financial reserves to be used as compensation for loss of wages by employes during periods when they become unemployed through no fault of their own. The principle of the accumulation of financial reserves, the sharing of risks, and the payment of compensation with respect to unemployment meets the need of protection against the hazards of unemployment and indigency. The Legislature, therefore, declares that in its considered judgment the public good and the general welfare of the citizens of this Commonwealth require the exercise of the police powers of the Commonwealth in the enactment of this act for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own.
43 P.S. § 752.

tion, as applied to the Law, pertains to the question of eligibility for benefits). As the Commonwealth Court stated, this could have the effect of depleting the trust fund of assets that would otherwise inure to the benefit of persons who stand most in need of them due to the lack of a pension or any other independent source of income. *See United States Steel*, 817 A.2d at 1260; *see also Penn Hills*, 496 Pa. at 624, 437 A.2d at 1215 (stating that the Law's purpose is to provide "some semblance of economic security" to individuals who become unemployed involuntarily); *Department of Labor and Indus. v. UCBR (Lybarger)*, 418 Pa. 471, 485, 211 A.2d 463, 470 (1965) (observing that, to draw upon the unemployment trust fund for purposes other than that for which it was designed jeopardizes its solvency and destroys its trust characteristics). In that sense, Claimant's proposed interpretation could have an opposite result to that which this Court deemed consistent with legislative intent in the cases upon which he relies.

It is also worth noting that, allowing a COLA give-back to qualify as an employee contribution would impose a substantial administrative burden upon the Board. *See Peak v. UCBR*, 509 Pa. 267, 273, 501 A.2d 1383, 1387 (1985) (describing the Board as a "busy agency, whose swift disposition of the many cases before it is vital to the subsistence of our fellow citizens who suffer lack of work"); *McNeill v. UCBR*, 510 Pa. 574, 579, 511 A.2d 167, 169 (1986) (explaining that the Board's procedural rules were designed to "provide for the quickest possible disposition of claims" in furtherance of the Law's goal of relieving economic insecurity); *Merida v. UCBR*, 117 Pa.Cmwlth. 181, 186, 543 A.2d 593, 595 (1988) (stating that the Board "receives thousands of appeals each year"). This, in turn, could potentially affect the Commonwealth's ability to comply with federal mandates. The reason is that, to maintain federal approval, a state's unemployment law and practice must, *inter alia*, "be reasonably calculated to insure full payment of unemployment compensation when due." 42 U.S.C. § 503(a)(1). The United States Supreme Court has interpreted this requirement to mean that states must ensure prompt administrative provision of unemploy-

ment compensation after an initial determination of eligibility. *See California Dep't of Human Res. Dev. v. Java,* 402 U.S. 121, 133, 91 S.Ct. 1347, 1355, 28 L.Ed.2d 666 (1971); *Fusari,* 419 U.S. at 388 n. 15, 95 S.Ct. at 539 n. 15. As the Commonwealth Court recognized,

> [w]here litigation involves exploring the basis for a collective bargaining agreement, which may require investigating poorly documented matters that might have occurred decades ago, discovery and litigation are severely hampered and unduly prolonged. We conclude that such a result was, in fact, *not* contemplated by our legislature when it passed the pension offset provision.

*United States Steel,* 817 A.2d at 1264 (emphasis in original). This conclusion is further supported by the General Assembly's decision to apply a 50 percent reduction in all cases involving employee contributions, rather than closely tailoring the offset to the size of the contribution; in particular, the 50 percent figure represents a midpoint mark and its general applicability suggests an intention to avoid time-consuming factual inquiries at the administrative level. *Cf. United States v. Cleveland Indians Baseball Co.,* 532 U.S. 200, 218, 121 S.Ct. 1433, 1444, 149 L.Ed.2d 401 (2001) (recognizing, as an aid to construction of certain provisions of the IRC, that Congress wished to minimize complexity and administrative confusion).[16]

▮ Finally, it is apparent from the congruity of the language in Section 404(d)(2) with that of the FUTA offset provision that the Legislature enacted the former with the objective of complying with the latter, so as to ensure continued federal certification. Indeed, Claimant concedes as much. *See* Brief for Appellant at 11.[17] It is therefore relevant that,

16. Claimant also argues that indirect employee contributions should qualify because the 50 percent offset applies where the employee has contributed "in any amount." However, the "any amount" condition pertains to the size of the contribution, not the circumstances under which the employee should be deemed to have contributed.

17. The Legislature's intention to comply with federal law generally is reflected in Section 207 of the Law, 43 P.S. § 767, which states that Pennsylvania's Secretary of Labor and Industry

after the Commonwealth Court filed its opinion in this matter, the United States Department of Labor issued a Program Letter addressing the precise legal issue raised here. The letter states, in pertinent part:

Question 4: During a collective bargaining process, employees may give up pay raises or cost of living adjustments in return for an increased employer contribution to the pension plan. May states consider these employer payments to be "contributions made by the individual?"

Answer: No. The controlling factor is whether the individual actually made any direct contributions to the plan. A direct contribution is one made by payroll deduction or otherwise from an employee's personal funds. A wage agreement that results in increased employer contributions to a retirement plan in exchange for a surrender in wages does not constitute a direct contribution to the pension plan by the employees.

This is consistent with other provisions of federal law. The Department of Labor's Pension, Welfare and Benefits Administration (PWBA) considers contributions made by an employer to a pension fund in these cases to be employer contributions for purposes of laws administered by PWBA. (Indeed, the Form 5500, Annual Return/Report of Employment Benefit Plan, filed by the employer, should reflect this.) Also, payments made by an employer to a retirement plan are not considered part of an employee's wages for federal income tax purposes under Section 3401 et seq., of the Internal Revenue Code (IRC). It would be inconsistent to attribute these contributions to employees for purposes of Section 3304(a)(15), FUTA (which is itself part of the IRC),

shall cooperate with the [United States] Department of Labor to the fullest extent consistent with the provisions of this act, and shall take such action through the adoption of appropriate rules, regulations, administrative methods and standards, as may be necessary to secure to this Commonwealth and its citizens all advantages available under the provisions of the Social Security Act that relate to unemployment compensation, the Federal Unemployment Tax Act [FUTA], the Wagner–Peyser Act and the Federal–State Extended Unemployment Compensation Act of 1970.
43 P.S. § 767(a)(1).

when other provisions of the IRC do not consider them employee contributions.

Department of Labor, Employment and Training Administration, Workforce Security Programs: Unemployment Insurance Program Letter Interpreting Federal Law, 68 Fed. Reg. 15241, 15242 (filed March 28, 2003) (the "DOL letter").

In light of the above, we believe it unlikely that the General Assembly would want the employee contributions referenced in Section 404(d)(2)(ii) of the Law to be understood any more broadly than the counterpart portion of FUTA. Therefore, consistent with FUTA's minimum pension offset requirements as interpreted by the Department of Labor, *see* *Whitaker Borough v. Pennsylvania Labor Relations Bd.*, 556 Pa. 559, 565, 729 A.2d 1109, 1112 (1999) (recognizing the appropriateness of harmonizing the interpretation of state legislation with federal laws that serve similar ends), and for the other reasons expressed above, we find that, for purposes of Section 404(d)(2)(ii) of the Commonwealth's Unemployment Compensation Law, 43 P.S. § 804(d)(2)(ii), an employee contribution signifies a direct contribution made by payroll deduction or otherwise from an employee's personal funds. This determination: reflects the plain meaning of the statute's text; assists in maintaining federal certification of the state's unemployment scheme; and advances the Law's twin goals of preserving funds for those individuals who would otherwise be at the highest risk of indigency, and promoting administrative efficiency and promptness in the distribution of benefits.

Accordingly, we affirm the order of the Commonwealth Court reversing the orders of the Board, and remand the matter to the Board for further proceedings consistent with this Opinion.

Justice BAER files a dissenting opinion.

Justice BAER, dissenting.

Because I cannot agree with the Majority's conclusion that employees must lose credit for the payment of wages to their pension fund, where, as here, an employer, due to legal

necessity, wrote the check that contributed employees' wages to employees' pension fund, I respectfully dissent.

The facts of this case are not in dispute. A 1977 agreement between the United Steelworkers of America (Union) and United States Steel Corporation (Employer) provided for a $.33 per hour cost-of-living adjustment (COLA) on May 1, 1980. On April 15, 1980, Union agreed that employees would forego their $.33 per hour contractually guaranteed COLA in exchange for an immediate and direct Employer contribution to the U.S. Steel Carnegie Pension Fund (Fund), which provided pension benefits for both current and future employees. Employer then made the lump sum payment directly to the Fund.[1]

In 2001, Appellant [2] was retired from Employer and receiving a monthly pension benefit from the Fund when he applied for and was awarded unemployment compensation.[3] Thus, the question presented herein is whether Appellant's forbearance of his entitlement to a pay raise in direct consideration for Employer's contribution of the foregone raise to the Fund equates to an employee contribution to the Fund for purposes of Section 404(d)(2)(ii) of the Unemployment Compensation Law, 43 P.S. § 804(d)(2)(ii).[4] If so, in accordance with the

1. As pointed out by the Majority, the Fund is non-contributory and contributions to the Fund can only be made by Employer. Thus, employees did not have the option of accepting their COLA and contributing it to the Fund through payroll deduction or otherwise. The record does not reflect the mathematical computations of the Union's salary concession or the employer's pension contribution. However, there is no dispute that this was a *quid pro quo* exchange.

2. While this case was brought by multiple parties, each presents the identical factual matrix. Accordingly, for ease of discussion, I will refer to Appellant(s) in the singular, as did the Majority Opinion.

3. It is not clear from the record how it came to be that so many employees were receiving retirement pensions and were, nevertheless, eligible for unemployment compensation. However, this fact is uncontested.

4. Section 404(d)(2)(ii) of the Unemployment Compensation Law, 43 P.S. § 804(d)(2)(ii), provides as follows:

   If the pension is entirely contributed to by the employer, then one hundred per centum (100%) of the pro-rated weekly amount of the pension shall be deducted. If the pension is contributed to by the

above provision of the Unemployment Compensation Law, it is uncontested that Appellant is entitled to 100 percent of his compensation benefits. If not, it is uncontested that he is entitled to only 50 percent of such benefits.

A fundamental axiom of contract law is that any bargained-for exercise, such as forbearance of a legal right, is valid consideration. Restatement (Second) of Contracts § 71 (1981);[5] *Hillcrest Foundation, Inc. v. McFeaters*, 332 Pa. 497, 2 A.2d 775 (Pa.1938) (holding that valid "consideration" confers a benefit upon the promisor or causes a detriment to the promisee and must be an act, forbearance or return promise bargained for and given in exchange for the original promise); *Cardamone v. University of Pittsburgh*, 253 Pa.Super. 65, 384 A.2d 1228, 1232 (1978) (citing *Hillcrest Foundation* ); *see also* 3 Williston on Contracts § 7:43 (4th ed.) (2004) (noting that just as a promisor may make an agreement for acts or promises to act, so he may bargain for forbearances or promises to forbear. Forbearance from exercising a right or doing an act which one has a right to do is legal consideration). This simple, fundamental, and legally uncontestable rule is applicable to this case.

One of Union's primary goals during the 1980 negotiations was enhancement of the Fund. To accomplish this goal, Union voluntarily relinquished its members', including Appellant's, contractually vested right to a wage increase, in exchange for Employer's contribution to the Fund. The *quid pro quo* in this instance is unique because it involved the give-back of a specific wage increase vested three years earlier in exchange for a specific contribution of a substantially similar, if not

individual, in any amount, then fifty per centum (50%) of the pro-rated weekly amount of the pension shall be deducted.

**5.** Restatement (Second) of Contracts § 71 (1981) provides:

(1) To constitute consideration, a performance or a return promise must be bargained for.

(2) A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise.

(3) The performance may consist of

\* \* \* \* \*

(b) a forbearance

identical, amount to the Fund. If the law had permitted, Appellant could simply have accepted his COLA and contributed it directly to the Fund. Because direct contributions were not permitted, the Union representing Appellant was forced to resort to the mechanism of foregoing the pay raise and constructively contributing it to the Fund, necessarily having it pass through Employer's hands. This legal necessity should not obfuscate or subvert what is substantively a simple and straightforward transaction through which Appellant contributed his forthcoming raise to his pension fund.

The majority supports its conclusion, in part, by noting that almost all negotiations involve two sides trading wages for benefits, however, the case *sub judice* is wholly distinguishable from such a general exchange in this regard. It did not involve either vague assertions or a union directed contribution of employer's funds. Rather, here Appellant ceding his absolute right to the COLA that three years earlier had been guaranteed to him in return for the contribution of that COLA to his pension fund.

The Majority justifies its position of ignoring the contract between Union and Employer by repeatedly asserting the importance of ensuring continued federal certification of Pennsylvania's Unemployment Compensation Fund.[6] As the Majority notes, the United States Department of Labor issued a program letter within which the following question was asked and, in pertinent part, answered:

**Question 4:** During a collective bargaining process, employees may give up pay raises or cost of living adjustments in return for an increased employer contribution to the pension plan. May states consider these employer payments to be "contributions made by the individual?"

**Answer:** No. The controlling factor is whether the individual actually made any direct contributions to the plan. A

---

**6.** As explained in the Majority Opinion, under the joint federal-state undertaking of unemployment compensation, states reap substantial benefits so long as their unemployment laws remain in compliance with federal requirements as determined by the United States Secretary of Labor.

direct contribution is one made by payroll deduction or otherwise from an employee's personal funds. A wage agreement that results in increased employer contributions to a retirement plan in exchange for a surrender in wages does not constitute a direct contribution to the pension plan by the employees. . . .

The Majority apparently considers this question and answer as controlling Pennsylvania's fate *vis-à-vis* federal unemployment compensation funds. I do not. This case does not involve the general forbearance of a pay raise or COLA in exchange for an increased contribution to a pension as part of a new collective bargaining agreement. Instead, a COLA specifically agreed to three years earlier and otherwise unrelated to the ongoing bargaining process was relinquished solely to permit such monies to be contributed to the Fund.

Moreover, the answer to Question 4 amplifies the federal government's misunderstanding of the situation. It opines that a direct contribution can only be made through a payroll deduction from employee's paycheck. However, as already noted, under the facts of this case Appellant can never direct that personal funds be contributed through a payroll deduction. If it were otherwise, Union would not have had to employ the mechanism that has resulted in Appellant's current situation. I do not believe that the federal program letter represents a clear answer to the facts before us or the answer that would necessarily be provided by a federal court considering this matter.

In conclusion, I would again note that this is an atypical contribution arising from unique negotiations. The Union wished to give back its COLA so that the pension fund would be bolstered. Employer was willing to act as the conduit to permit this to occur. It is erroneous to ignore the intent of the parties. Likewise, it is erroneous to compare this case to one where vague promises of benefits are exchanged for speculative wage increases. Appellant relinquished not a mere bargaining position, but an actual amount of money with present value that Employer was obligated to pay him. Thus, in my view, the COLA give-back should be considered an

employee contribution to the pension fund, and Appellant is entitled to have the offset against his unemployment benefits reduced from 100% to 50%.[7]

---

7. By holding that the COLA give-back is not an employee contribution, the majority implicitly approves the Commonwealth Court's reversal of its prior decision in *Ehman v. UCBR*, 776 A.2d 1031 (Pa.Cmwlth.2001). I recognize that *Ehman's* reasoning is consistent with my view, and believe that the Commonwealth Court handled this issue correctly the first time it considered this matter.