IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Linda N. Johnson,                            :
                        Petitioner           :
                                             :
            v.                               :    No. 1087 C.D. 2023
                                             :    Argued: September 9, 2024
Unemployment Compensation                    :
Board of Review,                             :
                        Respondent           :

BEFORE:    HONORABLE ELLEN CEISLER, Judge[1]
           HONORABLE LORI A. DUMAS, Judge
           HONORABLE MARY HANNAH LEAVITT, Senior Judge

OPINION
BY SENIOR JUDGE LEAVITT                    FILED:  February 11, 2025


            Linda N. Johnson (Claimant) has petitioned for this Court's review of
the adjudication of the Unemployment Compensation Board of Review (Board) that
denied her application for pandemic unemployment assistance (PUA) benefits.
Claimant challenges the Board's determination that she was not an "individual [who]
has to quit his or her job as a direct result of COVID-19."    15 U.S.C.
§9021(a)(3)(A)(ii)(I)(ii).  Upon review, we reverse the Board.

## Background

            Claimant worked for Chambersburg Hospital (Employer) in outpatient
registration.  She worked full time from May 13, 2019, until March 26, 2020, at
which point her hours were reduced to part time for the remainder of her
employment.[2]  On December 10, 2020, Claimant resigned.  She applied for

---

[1] The Court reached the decision in this case prior to the conclusion of Judge Ceisler's service on
the Commonwealth Court.

[2] Claimant received both state unemployment and Federal Pandemic Unemployment
Compensation (FPUC) after her hours were reduced because of the pandemic.  Board Adjudication
Finding of Fact No. 3.

unemployment compensation benefits and was found ineligible under Section 402(b) of the Unemployment Compensation Law (Unemployment Compensation Law).[3]  Claimant did not appeal.[4]  She then applied for PUA benefits.  When the Service Center denied her application, Claimant appealed.

The Referee conducted a telephonic hearing that was attended by Claimant and her attorney.[5]  The Department of Labor and Industry did not appear or present evidence.

Claimant testified about her resignation.  During 2020, she discovered that she had heart issues including "possible damage or [] a possible heart attack to the left side of [her] heart[,]" and a scan showed that her heart was enlarged.  Notes of Testimony (N.T.), 4/20/2022, at 5; Certified Record at 58 (C.R. __).  At the time of her resignation, she was under the treatment of a cardiologist, who diagnosed her with arrythmia, tachycardia, and "a condition called COTS (phonetic), which is cardiovascular and neurological."  N.T. 5; C.R. 58.  Several days before the Referee hearing, she had a loop recorder inserted in her chest because her cardiologist "suspect[ed] there may also be another issue."  N.T. 6; C.R. 59.

Claimant testified that Employer provided her with a surgical mask during the COVID-19 pandemic, which caused her to experience breathing problems.  She was required to wear the mask for the entire eight-hour shift, which

---

[3] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. §802(b).  It states, in pertinent part, that "[a]n employe shall be ineligible for compensation for any week . . . --(b) [i]n which his unemployment is due to voluntarily leaving work without cause of a necessitous and compelling nature[.]"  *Id.*

[4] Claimant testified that the deadline for appealing her denial of state benefits had passed by the time she received the denial notice.  Notes of Testimony, 4/20/2022, at 5 (N.T. __); Certified Record at 58 (C.R. __).

[5] The Referee explained, at the beginning of the hearing, that because employers do not fund the federal PUA program, they are not notified of the hearings.  N.T. 2; C.R. 55.

2

caused intense headaches, nausea, and vomiting; she had to leave work early "due to these issues." N.T. 6; C.R. 59. In any case, the mask did not protect her from COVID-19 because it was not an N-95 mask. Claimant testified that she had received "a written paper stating that [the] mask was not for [her] protection" but, rather, "for the protection of the patient[s]." N.T. 7; C.R. 60. Claimant's breathing issues were not related to her heart condition but diagnosed as caused by a severely deviated septum and cyst in her nose. N.T. 6; C.R. 59.

Claimant testified that her position in outpatient registration exposed her to COVID-19 "on a daily basis" because many of these patients were "COVID suspected." N.T. 6; C.R. 59. Employer did not require patients to wear a mask. Claimant testified that it was "very well known" that COVID-19 presented a significant risk to persons with "heart issues and breathing issues." N.T. 5; C.R. 59. She brought her health concerns to Employer "several times" and made suggestions to improve safety, but she received no response. N.T. 7-8; C.R. 60-61. She applied for, and was denied, a transfer to another department that authorized remote work. Claimant did not believe there was "anything else [she] could have done" to preserve her employment. N.T. 8; C.R. 61.

The Referee denied Claimant PUA benefits for the stated reason that Claimant did not quit her job as a direct result of COVID-19. Claimant appealed to the Board.

## Board Adjudication

By adjudication of August 30, 2023, the Board affirmed the Referee. Section 2102(a)(3)(A)(i) of the Coronavirus Aid, Relief, and Economic Security

3

("CARES") Act[6] provides that an individual determined ineligible for "regular unemployment" under state law must "be considered for PUA benefits." Board Adjudication at 3. The Board took official notice of the fact that Claimant had been determined ineligible for state unemployment benefits under Section 402(b) of the Unemployment Compensation Law, 42 P.S. §802(b). As such, Claimant was eligible to be considered for PUA benefits.

The Board denied Claimant PUA benefits, concluding that she did not prove that she "quit" her job as a "direct result" of the COVID-19 pandemic. 15 U.S.C. §9021(a)(3)(A)(ii)(I)(ii). Specifically, Claimant did not contract COVID-19; did not receive advice from a health professional to self-quarantine; and did not provide written medical documentation of her heart and breathing problems. Board Adjudication, Finding of Fact No. 9. Claimant proved only that she left her employment due to "general concerns or fears about contracting COVID-19," which "do not confer a right to collect PUA benefits." *Id*., Discussion at 3. Claimant testified that the mask caused breathing issues and that she was undergoing testing on her heart. However, the Board held Claimant needed to present medical evidence of her heart condition and specific medical advice to self-quarantine to prove that her loss of employment was the direct result of COVID-19. *Id*.

Claimant petitioned for this Court's review of the Board's adjudication.

---

[6] 15 U.S.C. §9021(a)(3)(A)(i). Section 2102(a)(3)(A)(i) of the CARES Act provides PUA benefits to that individual who

> *is not eligible for regular compensation* or extended benefits *under State* or Federal *law* or pandemic emergency unemployment compensation under section 9025 of this title, *including an individual who has exhausted all rights to regular unemployment* or extended benefits *under State* or Federal *law* or pandemic emergency unemployment compensation under section 9025 of this title[.]

15 U.S.C. §9021(a)(3)(A)(i) (emphasis added).

4

## Appeal

On appeal,[7] Claimant raises five issues,[8] which we consolidate into two for clarity.

In her first issue, Claimant argues that the Board erred in finding that Claimant did not "quit her job as a direct result of COVID-19," Board Adjudication, Discussion at 3, and, thus, was not a "covered individual" within the meaning of Section 2102(a)(3) of the CARES Act. 15 U.S.C. §9021(a)(3). Claimant worked in a hospital registering patients being admitted for COVID-19 at a time when the vaccine had not yet been developed. Contracting COVID-19 would have been especially dangerous to her because of her heart condition and breathing problems. She resigned only after her request to transfer to another work location was denied. The Board accepted Claimant's testimony as credible but not sufficient, holding that Claimant needed to present medical evidence to make her case. Claimant asserts that the Board imposed an eligibility requirement upon her that does not exist in the CARES Act.

---

[7] Our review of the Board's adjudication determines whether an error of law was committed, constitutional rights were violated, or necessary findings of fact were supported by substantial evidence. *Frazier v. Unemployment Compensation Board of Review*, 833 A.2d 1181, 1183 n.4 (Pa. Cmwlth. 2003). The Board is the ultimate factfinder in unemployment compensation cases and is, therefore, "entitled to make its own determinations as to witness credibility and evidentiary weight." *Serrano v. Unemployment Compensation Board of Review*, 149 A.3d 435, 439 (Pa. Cmwlth. 2016).

[8] The five issues listed in the Statement of Questions Involved are: (1) whether the Board erred when it found Claimant was not a covered individual within the meaning of Section 2102(a)(3) of the CARES Act; (2) whether the Board erred when it found that Claimant did not quit her employment as a direct result of COVID-19; (3) whether the Board erred when it denied Claimant benefits because she did not have the advice of a qualified health professional to quit her employment; (4) whether the Board erred in requiring Claimant to submit medical documentation of her health issues to show that she quit employment as a direct result of COVID-19; and (5) whether the Board's Finding of Fact No. 6, that Claimant was issued a mask for her protection, is supported by substantial evidence in the record. Claimant Brief at 3-4.

Claimant acknowledges that the CARES Act did not define the term "quit his or her job as a direct result of COVID-19," and the phrase has not heretofore been construed. The Board's brief cites the federal regulation for disaster unemployment assistance, which addresses a loss of employment that is the "direct result" of "natural, local disasters." Claimant argues that this regulation has limited relevance to her case. Claimant directly interacted with patients who had or were suspected of having COVID-19, and this exposure presented an unacceptable risk to Claimant because of her heart and breathing issues.

In support, Claimant directs our attention to an unpublished decision of the Court of Appeals of Arizona, *Mahuwe v. Arizona Department of Economic Security*, No. 1-CA-UB 21-0148, 2023 WL 3364483 (Ariz. Ct. App. May 11, 2023) (*Mahuwe*). In that case, a self-employed Uber driver stopped working during the pandemic, before a vaccine was available, because he suffered from asthma. The administrative panel did not question the claimant's credibility, and no contradictory evidence was offered. However, the panel found that he chose to stop working due to "general concerns about COVID-19," which was not sufficient to satisfy the CARES Act. *Id*. at *5. The Court of Appeals of Arizona reversed, concluding that the administrative panel's interpretation of the CARES Act was "too narrow." *Id*. at *6. The Court of Appeals reasoned that where an individual with specific health concerns quits because of "an unacceptable risk of exposure to the virus," he has done so as a direct result of COVID-19. *Id*.

Claimant argues that the *Mahuwe* decision is persuasive and asks this Court to adopt its rationale. Claimant further contends that the phrase "direct result of COVID-19" must be "framed within the remedial nature of both the CARES Act and [the] Unemployment Compensation Law." Claimant Brief at 16.

6

In her second issue, Claimant argues that the Board's Finding of Fact No. 6 is not supported by substantial evidence. In that finding, the Board stated that Claimant "was given a hospital mask as a safety precaution during the COVID-19 pandemic." Board Adjudication, Finding of Fact No. 6. Claimant argues that this finding misconstrued her testimony. The mask provided by Employer was to benefit others, not Claimant. Employer knew that the surgical mask did not protect Claimant from the risk of contracting COVID-19 from the patients she was registering for admission.

In response to Claimant's issues, the Board explains, first, that the federal disaster assistance regulation at 20 C.F.R. Part 625 and the April 5, 2020, program letter of the United States Department of Labor (DOL)[9] support its holding. They establish that quitting a job is not a "direct result of COVID-19" when it results from a "longer chain of events precipitated or exacerbated by the [pandemic]." Board Brief at 17 (quoting 20 C.F.R. §625.5(c)). The Board argues that "direct result" occurs, for example, where an individual contracts COVID-19 and later develops "health complications that render the individual objectively unable to perform his or her essential job functions[.]" Board Brief at 18 (quoting Program Letter No. 16-20, 4/5/2020, at I-6). Such evidence is lacking here. Claimant's heart condition and breathing issues were not caused or exacerbated by the pandemic. Claimant's resignation was based upon only "general concerns or fears about contracting COVID." Board Adjudication, Discussion at 3.

The Board asserts that Claimant's challenge to Finding of Fact No. 6 lacks merit because her testimony established that she was provided a mask and,

---

[9] UNEMPLOYMENT INSURANCE PROGRAM LETTER No. 16-20, https://www.dol.gov/sites/dolgov/files/ETA/advisories/UIPL/2020/UIPL_16-20.pdf (last visited February 11, 2025).

thus, the factual finding is binding. Board Brief at 7. In any case, the Board also found in Finding of Fact No. 7 that Claimant complained to Employer that the mask was inadequate to protect her from COVID-19.

**Applicable Statutory Law and Federal Guidance**

Section 2102(a)(3) of the CARES Act defines the "covered individual" who is eligible for PUA benefits. It states:

> The term "covered individual"--
>
> **(A)** means an individual who--
>
>> **(i)** *is not eligible for regular compensation or extended benefits under State or Federal law* or pandemic emergency unemployment compensation under section 9025 of this title, including an individual who has exhausted all rights to regular unemployment or extended benefits under State or Federal law or pandemic emergency unemployment compensation under section 9025 of this title;
>>
>> **(ii)** *provides self-certification that the individual--*
>>
>>> **(I)** *is otherwise able to work and available for work within the meaning of applicable State law, except the individual is unemployed, partially unemployed, or unable or unavailable to work because--*
>>>
>>>> **(aa)** the individual has been diagnosed with COVID-19 or is experiencing symptoms of COVID-19 and seeking a medical diagnosis;
>>>>
>>>> **(bb)** a member of the individual's household has been diagnosed with COVID-19;
>>>>
>>>> **(cc)** the individual is providing care for a family member or a member of the individual's household who has been diagnosed with COVID-19;
>>>>
>>>> **(dd)** a child or other person in the household for which the individual has primary caregiving responsibility is unable to attend

8

school or another facility that is closed as a direct result of the COVID-19 public health emergency and such school or facility care is required for the individual to work;

**(ee)** the individual is unable to reach the place of employment because of a quarantine imposed as a direct result of the COVID-19 public health emergency;

**(ff)** *the individual is unable to reach the place of employment because the individual has been advised by a health care provider to self-quarantine due to concerns related to COVID-19*;

**(gg)** the individual was scheduled to commence employment and does not have a job or is unable to reach the job as a direct result of the COVID-19 public health emergency;

**(hh)** the individual has become the breadwinner or major support for a household because the head of the household has died as a direct result of COVID-19;

**(ii)** *the individual has to quit his or her job as a direct result of COVID-19*;

**(jj)** the individual's place of employment is closed as a direct result of the COVID-19 public health emergency; or

**(kk)** *the individual meets any additional criteria established by the Secretary [of Labor] for unemployment assistance under this section*[.]

15 U.S.C. §9021(a)(3) (emphasis added). In sum, the CARES Act lists 11 different qualifying grounds for PUA benefits where the claimant's unemployment relates to COVID-19.

The CARES Act further provides that PUA benefits are modeled on disaster unemployment assistance. Section 2102(h) of the CARES Act states:

> **(h) Relationship between pandemic unemployment assistance and disaster unemployment assistance**
>
> *Except* as otherwise provided in this section or *to the extent there is a conflict between this section and part 625* of title 20, Code of Federal Regulations, such part 625 shall apply to this section as if--
>
>> **(1)** the term "COVID-19 public health emergency" were [sic] substituted for the term "major disaster" each place it appears in such part 625; and
>>
>> **(2)** the term "pandemic" were [sic] substituted for the term "disaster" each place it appears in such part 625.

15 U.S.C. §9021(h) (emphasis added). Section 625.5(c) of Title 20 states, in relevant part, as follows:

> (c) Unemployment is a direct result of the major disaster. For the purposes of paragraphs (a)(1) and (b)(1) of this section, *a worker's or self-employed individual's unemployment is a direct result of the major disaster where the unemployment is an immediate result of the major disaster itself, and not the result of a longer chain of events precipitated or exacerbated by the disaster*. Such an individual's unemployment is a direct result of the major disaster if the unemployment resulted from:
>
>> (1) The physical damage or destruction of the place of employment;
>>
>> (2) The physical inaccessibility of the place of employment in the major disaster area due to its closure by or at the request of the federal, state or local government, in immediate response to the disaster; or
>>
>> (3) Lack of work, or loss of revenues, provided that, prior to the disaster, the employer, or the business in the case of a self-employed individual, received at least a majority of its revenue or income from an entity in the major disaster area that was either damaged or destroyed in the disaster,

10

> or an entity in the major disaster area closed by the federal, state or local government in immediate response to the disaster.

20 C.F.R. §625.5(c) (emphasis added). In short, the regulation offers three examples of where loss of employment is the "direct result of the major disaster." *Id*.

Finally, DOL's program letter offers illustrative examples of the eligibility grounds set forth in 15 U.S.C. §9021(a)(3). As to the individual who has to "quit" his or her job as a direct result of COVID-19, the letter offered one example:

> An individual was diagnosed with COVID-19 by a qualified medical professional, and although the individual no longer has COVID-19, the illness caused health complications that render the individual objectively unable to perform his or her essential job functions, with or without a reasonable accommodation.
>
> . . . .
>
> States should also note that, for purposes of section 2102(a)(3)(A)(ii)(I)(ii), an individual does not have to quit his or her job as a direct result of COVID-19 if paid sick leave or other paid leave benefits are available to the individual. Generally, an employee "has to quit" within the meaning of this section only when ceasing employment is *an involuntary decision compelled by the circumstances* identified in this section.
>
> *In general, a determination about whether actions are a "direct result," as explained above, should be made based on 20 C.F.R. [§]625.5(c)*. When making a determination under the regulation, *states should take into account specific circumstances unique to the COVID-19 public emergency*. For example, if a business is shut down due to an emergency declaration or due to necessary social distancing protocols, the unemployment of individuals who worked in the business would be considered a direct result of COVID-19.

Program Letter No. 16-20, 4/5/2020, at I-6-I-7 (emphasis added). The letter explains that the list of examples is not intended to be exhaustive.

11

We turn to Claimant's appeal, considering these above-cited provisions of law and agency guidance.

**Analysis**

We begin with Claimant's claim that the Board erred in holding that she did not "quit [] her job as a direct result of COVID-19." 15 U.S.C. §9021(a)(3)(A)(ii)(I)(ii).

The CARES Act provides that PUA benefits are intended for individuals who are not eligible for state unemployment compensation benefits. 15 U.S.C. §9021(a)(3)(A)(i). This includes a claimant who has left employment without a necessitous and compelling reason under Section 402(b) of the Unemployment Compensation Law. Board Adjudication, Discussion at 3. Next, the applicant must self-certify that her unemployment was due to at least 1 of the 11 grounds provided in the CARES Act to be eligible for PUA benefits. 15 U.S.C. §9021(a)(3)(A)(ii)(I). One such ground is a person who "has to quit his or her job as a direct result of COVID-19." 15 U.S.C. §9021(a)(3)(A)(ii)(I)(ii).

Here, the Board found that Claimant quit her job due to "general concerns or fears about contracting COVID-19[,]" which did "not confer a right to collect PUA benefits." Board Adjudication, Discussion at 3. Specifically, Claimant needed to present medical evidence to document her heart condition and specific medical advice to self-quarantine to establish that she quit her job as a direct result of COVID-19. *Id*. The Board erred in this regard.

The only evidence required under the CARES Act is a "self-certification." 15 U.S.C. §9021(a)(3)(A)(ii)(I). To be sure, medical evidence of a high a risk of a serious or fatal illness should the claimant contract COVID-19 and medical advice to self-quarantine would be compelling evidence. However,

12

Congress did not require such evidence. Neither the Referee nor the Board questioned Claimant's credibility. Her testimony about the existence of her heart condition and about her regular exposure to COVID-19 patients in her workplace was accepted.[10]

The Board maintains that the adjudication's discussion on medical advice to self-quarantine was actually referring to Section 2102(a)(3)(A)(ii)(I)(ff) of the CARES Act, a separate ground for PUA benefits. Subsection (ff) addresses the individual who is "unable to reach the place of employment because the individual has been advised by a health care provider to self-quarantine due to concerns related to COVID-19[.]" 15 U.S.C. §9021(a)(3)(A)(ii)(I)(ff). The Board did not cite subsection (ff) in its adjudication, which is a separate qualifying reason. One who has been directed to self-quarantine cannot enter any workplace, usually because the individual has an active disease. In short, subsection (ff) is irrelevant to the meaning of subsection (ii), which qualifies claimants who quit as a direct result of COVID-19 for PUA.

The Board also reasoned that Claimant quit her employment as "the result of a longer chain of events precipitated or exacerbated" by the pandemic and not as a direct result of COVID-19. Board Adjudication, Discussion at 3. The Board plucked this phrase from the federal disaster assistance regulation, without citation or explanation. There are several problems with the Board's use of the phrase "longer chain of events precipitated or exacerbated by the disaster" in its analysis. 20 C.F.R. §625.5(c).

---

[10] The dissent notes that the Board did not expressly credit Claimant's testimony. Because all of the Board's factual findings are based upon her testimony, it can be inferred that her testimony was believed, and the Board does not otherwise argue. The Board's position is that Claimant's testimony was inadequate, not that it was unreliable.

First, Congress did not place the language "result of a longer chain of events precipitated or exacerbated by the [pandemic]" into Section 2102(a)(3)(A)(ii). Its absence must be regarded as intentional.

Second, Section 625.5(c) lists three examples of what constitutes a "direct result" of a disaster: physical damage to the workplace; inability to access the workplace; and workplace closure because of disaster-related loss of revenue. 20 C.F.R. §625.5(c). Workplace closure and inability to access the workplace are expressly covered in the CARES Act. *See* 15 U.S.C. §9021(a)(3)(A)(ii)(I)(ee), (ff), and (jj). Section 625.5(c) is inapposite because Claimant's workplace was neither closed nor inaccessible.

Third, the Board did not identify this "longer chain of events" that it believed to relate to Claimant's decision to quit her job.[11] Claimant did not resign because of the "event" of her heart condition. Rather, she resigned because her job in a hospital presented her with daily and unavoidable exposure to patients with COVID-19 and her request for a transfer was denied.

Finally, the Board invokes the DOL's program letter of April 5, 2020, which offered a single example of an individual who "has to quit his or her job as a direct result of COVID-19." 15 U.S.C. §9021(a)(3)(A)(ii)(I)(ii). That example stated as follows:

> An individual was diagnosed with COVID-19 by a qualified medical professional, and *although the individual no longer has COVID-19*, the illness caused health complications that render

---

[11] In the context of a disaster, this phrase is apt. A workplace that has experienced a fire just before the disaster hit cannot assert that its closure was the direct result of the disaster. The disaster only exacerbated the earlier event. Accordingly, the employees at that workplace will not be eligible for disaster unemployment assistance (DUA). Notably, the disaster regulation is not to be applied to the PUA benefits where it conflicts with the CARES Act. 15 U.S.C. §9021(h).

14

> the individual objectively unable to perform his or her essential
> job functions, with or without a reasonable accommodation.

Program Letter No. 16-20, 4/5/2020, at I-6 (emphasis added).[12]  The program letter clarified that the list of examples was not intended to be exhaustive.  *Id*. at I-4. Nevertheless, the single example of "has to quit" states that the applicant may be one who "no longer has COVID-19." *Id*. at I-6.  Had Congress intended to limit PUA benefits to those individuals who had previously contracted COVID-19 and were disabled by its aftereffects, it would have so stated.  Instead, Congress chose language broad enough to cover an applicant who does not yet have the disease but faces an "unacceptable risk" of COVID-19 in the workplace, *Mahuwe*, 2023 WL 3364483, at *6, as well as an applicant who "no longer" has COVID-19.  The Board's brief does not analyze *Mahuwe*; it simply observes that it is non-precedential.

Claimant's decision to quit her job was "an involuntary decision compelled by the circumstances" of her position, the critical function of which required daily exposure to patients with COVID-19.  DOL Program Letter, 4/5/2020, at I-7.  Her concerns about contracting COVID-19 were not "general" but specific to her health conditions and to the presence of COVID-19 patients in the workplace. She did not assert a need to self-quarantine; to the contrary, she was available for work in a less risky environment.

---

[12] The relevance of the DOL program letter is limited.  "*Chevron* deference" refers to the United States Supreme Court's seminal decision in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984), which stated that federal courts had "long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer[.]"  The Supreme Court overruled *Chevron* in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), in which it held that courts need not defer to an agency's interpretation of the law simply because a statute is ambiguous.

The dissent sidesteps the issue of whether Claimant quit as a direct result of COVID-19. It would hold that anyone found ineligible for state benefits under Section 402(b) of the Unemployment Compensation Law is automatically ineligible for PUA benefits. Effectively, the dissent reverses the Board's holding that Claimant satisfied the first prong of eligibility for PUA benefits. The dissent relies upon the DOL program letter and two decisions from other jurisdictions, which held that "quitting work without good cause" renders an applicant ineligible for PUA benefits. *Johnson v. Unemployment Compensation Board of Review*, __ A.3d __, (Pa. Cmwlth., No. 1087 C.D. 2023, filed February 11, 2025) (Dumas, J. dissenting), slip op. at 8-9 (quotation omitted and emphasis in original omitted). This issue, raised *sua sponte* by the dissent, is not before the Court. Even so, it has problems.

First, the DOL's letter does not specify what is meant by "good cause"; the term appears once in 43 pages.[13] The language "necessitous and compelling reason," not "good cause," is what appears in Section 402(b) of the Unemployment Compensation Law, 42 P.S. §802(b). The parties have not addressed the meaning of "good cause" or explained whether it is the same or different from "necessitous and compelling reason" because it was not an issue in this appeal.[14]

Second, the cases cited by the dissent do not shed light on the meaning of "good cause" and are factually indistinguishable. In *Winter v. New Mexico*

---

[13] UNITED STATES DEPARTMENT OF LABOR, *Unemployment Insurance Program Letter No. 16-20*, available at https://www.dol.gov/sites/dolgov/files/ETA/advisories/UIPL/2020/UIPL_16-20.pdf (last visited February 11, 2025). The guideline states, on the second page, that "quitting work without good cause to obtain [federal Unemployment Insurance] benefits is fraud under PUA." The term "good cause" appears only once in this 43-page document.

[14] The phrase "necessitous and compelling reason" has been construed to require a claimant to try to preserve employment, notwithstanding a medical problem. *St. Clair Hospital v. Unemployment Compensation Board of Review*, 154 A.3d 401, 405 (Pa. Cmwlth. 2017). There is no basis to believe that "good cause" is similarly nuanced.

16

*Department of Workforce Solutions*, Civ. No. 21-475 JFR/SCY, 2022 WL 4132740, at \*8 (D. N.M. September 12, 2022), the plaintiffs acknowledged that they "voluntarily [left] their employment without good cause." *Id*. In *Sullivan v. Board of Review, Department of Labor*, 272 A.3d 44 (N.J. Super. Ct. App. Div. 2022), the claimant stipulated that he left his job "for personal reasons" and *not* as the direct result of COVID-19. Claimant, by contrast, attributes her resignation to COVID-19. *A fortiori*, one who quits a job as a direct result of COVID-19 has demonstrated good cause.

Third, the record does not contain the determination of the Unemployment Compensation (UC) Service Center on Claimant's application for unemployment compensation. Accordingly, it is impossible to determine factually why Claimant was found ineligible under Section 402(b) or to draw any inference therefrom relating to good cause.

Had Claimant appealed the UC Service Center's determination, she may have prevailed. In *Concordia of the South Hills v. Unemployment Compensation Board of Review* (Pa. Cmwlth., No. 602 C.D. 2022, filed August 17, 2023) (unreported), a COVID-related case, this Court held that the claimant had a necessitous and compelling reason to resign because she communicated her asthma and concerns about inadequate safety measures to the employer, which failed to accommodate the claimant's needs or instruct her how to otherwise properly request a transfer. The facts in *Concordia* are very similar to the facts here.

Claimant's testimony is the only evidence, and it was used by the Board in its findings of fact. That testimony established that Claimant had heart and breathing problems and that she had daily interaction with patients who had, or were suspected of having, COVID-19. We conclude that the testimony was sufficient to

17

establish that she "ha[d] to quit [] her job as a direct result of COVID-19," and she is, therefore, a covered individual under the CARES Act eligible for PUA benefits. 15 U.S.C. §9021(a)(3)(A)(ii)(I)(ii). As in *Mahuwe*, 2023 WL 3364483, at *6, Claimant quit because of "an unacceptable risk of exposure to the virus," given her compromised health.

## Conclusion

The CARES Act provides that the PUA benefits are intended for individuals who (i) are not eligible for regular unemployment compensation benefits and (ii) have quit their job as a direct result of COVID-19. The Board erred in concluding Claimant was required to present medical evidence that she was at high risk for severe illness or death from contracting COVID-19 or that she had been advised by her treating physician to self-quarantine. Her self-certification of her heart and breathing issues and daily exposure to COVID-19 in the hospital was sufficient to make her case that she quit her job as a direct result of COVID-19.

Accordingly, we reverse the Board's adjudication.[15]

_____
MARY HANNAH LEAVITT, President Judge Emerita

---

[15] Therefore, we need not address Claimant's second issue, which challenges the Board's Finding of Fact No. 6 as to whether Employer provided masks to Claimant as a safety precaution for herself or only to benefit others.

18

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Linda N. Johnson,                          :
                          Petitioner       :
                                           :
          v.                               :          No. 1087 C.D. 2023
                                           :
Unemployment Compensation                  :
Board of Review,                           :
                          Respondent       :

# **O R D E R**

AND NOW, this 11th day of February, 2025, the adjudication of the Unemployment Compensation Board of Review in the above-captioned matter, dated August 30, 2023, is REVERSED.

_____
MARY HANNAH LEAVITT, President Judge Emerita

Linda N. Johnson, :
           Petitioner :
            :
            : No. 1087 C.D. 2023
        v. :
            : Argued: September 9, 2024
Unemployment Compensation :
Board of Review, :
           Respondent :

BEFORE:   HONORABLE ELLEN CEISLER, Judge
              HONORABLE LORI A. DUMAS, Judge
              HONORABLE MARY HANNAH LEAVITT, Senior Judge

**DISSENTING OPINION BY**
**JUDGE DUMAS**                            **FILED: February 11, 2025**

Respectfully, I dissent. In my view, particularly in light of the factual and procedural circumstances present, the Court should accept this opportunity to establish a clear, bright line rule that when a claimant has been disqualified from receiving unemployment benefits, this disqualification necessarily precludes pandemic unemployment assistance (PUA) benefits.[1] Thus, I would affirm the Unemployment Compensation Board of Review (Board), albeit on different grounds.[2]

---

[1] Pandemic unemployment assistance (PUA) benefits are provided under Section 2102 of the Coronavirus Aid, Relief, and Economic Security Act of 2020 (CARES Act), 15 U.S.C. § 9021.

[2] We may affirm an agency's decision where other valid grounds exist. *Turner v. Unemployment Comp. Bd. of Rev.*, 899 A.2d 381 (Pa. Cmwlth. 2006).

# I. DISCUSSION

## A. Initial Observations

Initially, I must disagree with the majority's presentation of the facts because I see no support for the majority's suggestion that the Board found Linda N. Johnson (Claimant) to be credible. *See generally* Bd.'s Dec., 8/30/23. The Board found that "[a]lthough [C]laimant *described* health problems, [C]laimant did not contract COVID-19, did not have a qualified health professional to advise her to self-quarantine, or have medical documentation." *Id.* at 2 (Finding of Fact # 9) (emphasis added). That is the sole finding relevant to Claimant's health.[3] In its discussion, the Board later reiterated, "While [C]laimant *alleged* she had breathing issues because of masking and was undergoing testing on her heart, [C]laimant did not have a qualified health professional to advise her to self-quarantine." *Id.* at 3 (emphasis added). The Board then concluded that "[u]nder these circumstances, [C]laimant's belief that she had to resign as a direct result of the COVID-19 pandemic is not supported by the record." *Id.* (emphasis added). Simply, in my view, the Board acknowledged Claimant's testimony but did not credit it.

For this reason, I must also disagree with the majority's favorable view of Claimant's failure to appeal from the initial denial of her state benefits. According to the majority, notice of the denial arrived *after* the appeal deadline had passed. The Board made no such finding. Moreover, mindful of our standard of review, even the suggestion that the Department of Labor and Industry [Department] deprived Claimant of an opportunity to challenge the Service Center's determination

---

[3] Additionally, the Board made two findings relevant to COVID-related precautions taken by the hospital. Bd.'s Dec., 8/30/23, at 2 (finding that Claimant "was given a hospital mask as a safety precaution" and that she "complained about wearing a mask and that the masks provided were insufficient").

is erroneous. Indeed, had the Department done so, there would be a strong claim for *nunc pro tunc* relief.

As it is, the Department denied Claimant unemployment compensation benefits under Section 402(b) of the Unemployment Compensation Law (UC Law).[4] Thus, Claimant voluntarily resigned from the hospital without cause of a necessitous and compelling nature. That is the settled law of this case.[5]

### B. Claimant is Not Entitled to PUA Benefits

### 1. The parties' arguments

Claimant contends that she established her eligibility for PUA benefits. *See* Pet'r's Br. at 11-39. According to Claimant, she is a "covered individual" under Section 2102 of the CARES Act because (1) she is not eligible for regular, extended, or pandemic emergency benefits under State or Federal law and (2) she self-certified

---

[4] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(b). Section 402(b) of the UC Law provides that an employee is ineligible for compensation for any week that her unemployment is due to voluntarily leaving work without a "necessitous and compelling" reason. 43 P.S. § 802(b).

[5] Clearly then, the majority's passing analogy to *Concordia of the South Hills v. Unemployment Compensation Board of Review* (Pa. Cmwlth., No. 602 C.D. 2022, filed August 17, 2023) (unreported), is misplaced. Here, unlike the claimant in *Concordia*, Claimant did not establish that her employer failed to accommodate proven health concerns.

LAD - 3

an enumerated reason for her unemployment. *Id.* at 15 (citing 15 U.S.C. § 9021(a)(3)(A)(i) and (ii)).[6, 7]

Claimant properly notes that the Board has not challenged her eligibility under the first prong of the covered individual test. *Id.* at 15-16; *see generally* Resp't's Br. As to the second prong, Claimant maintains that her credible

---

[6] The CARES Act provides the following enumerated reasons:

(aa) the individual has been diagnosed with COVID-19 or is experiencing symptoms of COVID-19 and seeking a medical diagnosis;

(bb) a member of the individual's household has been diagnosed with COVID-19;

(cc) the individual is providing care for a family member or a member of the individual's household who has been diagnosed with COVID-19;

(dd) a child or other person in the household for which the individual has primary caregiving responsibility is unable to attend school or another facility that is closed as a direct result of the COVID-19 public health emergency and such school or facility care is required for the individual to work;

(ee) the individual is unable to reach the place of employment because of a quarantine imposed as a direct result of the COVID-19 public health emergency;

(ff) the individual is unable to reach the place of employment because the individual has been advised by a health care provider to self-quarantine due to concerns related to COVID-19;

(gg) the individual was scheduled to commence employment and does not have a job or is unable to reach the job as a direct result of the COVID-19 public health emergency;

(hh) the individual has become the breadwinner or major support for a household because the head of the household has died as a direct result of COVID-19;

(ii) the individual has to quit his or her job as a direct result of COVID-19;

(jj) the individual's place of employment is closed as a direct result of the COVID-19 public health emergency; or

(kk) the individual meets any additional criteria established by the Secretary for unemployment assistance under this section . . . .

15 U.S.C. § 9021(a)(3).

[7] Claimant does not address a third requirement, which is not at issue here. *See* 15 U.S.C. § 9021(a)(3)(A)(iii) (requiring a claimant to provide documentation that substantiates employment or self-employment).

testimony established that her resignation from her employer was "a direct result of COVID-19." *See* Pet'r's Br. at 30-36 (citing 15 U.S.C. § 9021(a)(3)(A)(ii)(I)(ii)). According to Claimant, she established very specific health concerns directly related to the pandemic; she expressed her concerns to her employer; and her employer's failure to remedy those concerns left her no choice but to resign her employment. *See id.*

Claimant concedes that this Court has not yet settled on an appropriate interpretation of the term, "direct result of COVID-19," but suggests that Federal guidelines in an analogous provision for disaster assistance are unhelpful because they fail to account for the unique challenges posed by the pandemic. *See* Pet'r's Br. at 18-22. Rather, Claimant directs our attention to an unpublished decision from Arizona, *Mahuwe v. Arizona Department of Economic Security*, 96 Az. Cases Digest 21 (filed May 11, 2023), 2023 WL 3364483, and encourages this Court to adopt a similar approach.

In *Mahuwe*, a self-employed Uber driver voluntarily ceased working during the pandemic because he suffered from asthma and COVID-19 vaccines were not yet available. 2023 WL 3364483, at *1. Despite testifying credibly, an administrative review panel denied the driver PUA benefits under subsection (A)(ii)(I)(ii), reasoning that he had chosen to stop working due to "general concerns about COVID-19." *Id.* at *5. Upon further review, the Arizona Court of Appeals reversed the panel decision, concluding that its interpretation of subsection (A)(ii)(I)(ii) was too narrow; rather, the court reasoned that an applicant is eligible if he or she can establish an "unacceptable risk of exposure to the virus in the workplace." *Id.* at *6.

According to Claimant, the *Mahuwe* Court held that "a claimant who has specific health concerns related to COVID-19 and quits because of an unacceptable risk of exposure to the virus in the workplace, does so as a 'direct result of COVID-19' and is a covered individual within the meaning of PUA." Pet'r's Br. at 22. In Claimant's view, the *Mahuwe* decision provides analogous circumstances and a persuasive analysis that supports an award of PUA benefits in this case. *See* Pet'r's Br. at 22-30.

Finally, Claimant takes issue with the Board's observation that Claimant lacked supporting testimony or documentation from a health care provider who advised Claimant to self-quarantine due to COVID-19-related concerns. *See id.* at 36-38. Claimant notes that subsection (a)(3)(A)(ii)(I)(ii) lacks an express requirement for such evidence, whereas other subsections include an express requirement. *See, e.g.*, 15 U.S.C. § 9021(a)(3)(A)(ii)(I)(ff) ("the individual is unable to reach the place of employment because the individual has been advised by a health care provider to self-quarantine due to concerns related to COVID-19").

In response to these arguments, the Board relies on provisions of the CARES Act, as well as federal guidelines and regulations that provide insight into the proper administration of the PUA regime. *See* Resp't's Br. at 15-25. The Board notes, for example, that the CARES Act requires that States look to regulations promulgated to administer the Disaster Unemployment Assistance (DUA) found in 20 C.F.R. Part 625. Resp't's Br. at 15-16 (citing 15 U.S.C. § 9021(h)).[8] The Board

---

[8] Section 2102(h) of the CARES Act provides:
(h) Relationship between pandemic unemployment assistance and disaster unemployment assistance
Except as otherwise provided in this section or to the extent there is a conflict between this section and part 625 of title 20, Code of Federal Regulations, such part 625 shall apply to this section as if--

also directs our attention to program letters (UIPL) issued by the United States Department of Labor (USDOL),[9] which have been cited favorably by the Pennsylvania Supreme Court.  *See id.* at 16-17 n. 8 ("Program [l]etters . . . inform the states of [the Department's] interpretation of controlling federal law . . . [and] play an important role in maintaining federal certification for a given state.") (quoting *U.S. Steel Corp. v. Unemployment Comp. Bd. of Rev.*, 858 A.2d 91, 98 (Pa. 2004) (emphasis removed)).

Thus, the Board continues, unemployment is "a direct result" of the pandemic when it is "an immediate result of the COVID-19 public health emergency itself, and not the result of a longer chain of events precipitated or exacerbated by the pandemic." *Id.* at 17 (quoting 20 C.F.R. § 625.5(c) (cleaned up)).  For example, the Board suggests that an individual previously diagnosed with COVID-19 by a qualified medical professional whose "illness caused health complications that render the individual objectively unable to perform his or her essential job functions" may qualify under subsection (a)(3)(A)(ii)(I)(ii).  *Id.* at 18 (quoting UIPL 16-20 at I-6).  Importantly, according to the Board, USDOL did not provide an exhaustive list of examples but instructed that "other qualifying circumstances . . . must be identified and applied in a manner consistent with the examples." *Id.* at 19 (quoting UIPL 16-20 at I-4) (emphasis removed).

---

(1) the term "COVID-19 public health emergency" were substituted for the term "major disaster" each place it appears in such part 625; and

(2) the term "pandemic" were substituted for the term "disaster" each place it appears in such part 625.

15 U.S.C. § 9021(h).

[9] UIPL 16-20 issued on April 5, 2020.  It may be found, along with its eight "Change" documents at https://www.dol.gov/agencies/eta/advisories/unemployment-insurance-program-letter-no-16-20 (last accessed 2/10/25).

Within this framework, the Board asserts that Claimant is not a "covered individual" under Section 2102 of the CARES Act. *See* Resp't's Br. at 19-23. According to the Board, Claimant's testimony confirmed that she had a preexisting heart condition, as well as breathing issues that were unrelated to COVID-19. *Id.* at 19-20. The Board also suggests that Claimant did not adequately relay her health and safety concerns to her employer. *See id.* at 20-21. For example, the Board argues, Claimant never linked her work-from-home transfer request to her underlying health concerns, nor did she document specific requests related to her safety. *See id.* (noting that Claimant did not request a face shield or plexiglass at her work station). Thus, the Board reasons, Claimant's resignation is more akin to a general fear of COVID-19 resulting from a "longer chain of events precipitated or exacerbated by" the pandemic, insufficient and too remote to qualify for PUA benefits. *See id.* at 22-23.

## 2. Claimant's disqualification under Section 402(b) precludes PUA benefits

Both parties have presented important arguments relevant to whether Claimant was an "individual [who] ha[d] to quit her job as a direct result of COVID-19." 15 U.S.C. § 9021(a)(3)(A)(ii)(I)(ii). However, in my view, these arguments miss the mark.

The CARES Act was intended to provide financial assistance to individuals affected by the COVID-19 Pandemic. *See generally* UIPL 16-20. The Act provides PUA benefits to any "covered individual" while such individual is unemployed or unable to work due to COVID-19 during weeks in which the individual is not entitled to any other unemployment compensation. 15 U.S.C. § 9021(a)(5). A "covered individual" is an individual who "is not eligible for regular

compensation or extended benefits under State or Federal law or pandemic emergency unemployment compensation." 15 U.S.C. § 9021(a)(3)(A)(i).

However, USDOL has advised participant states of the importance of program integrity, stressing that "individuals are only entitled to benefits if they are no longer working through no fault of their own[.]" UIPL 16-20 at I-2. Moreover, USDOL has further advised that "quitting work *without good cause* to obtain [unemployment insurance] benefits is fraud under PUA." *Id.* (emphasis added) (noting an expectation that States would enforce eligibility requirements, recover overpayments, and disqualify individuals for fraud); *see also* 20 C.F.R. § 625.14.

I have not found a Pennsylvania decision directly on point. *But see Neal v. Unemployment Comp. Bd. of Rev.* (Pa. Cmwlth., No. 435 C.D. 2023, filed July 8, 2024) (unreported), 2024 WL 3320437, at *9 (affirming the Board's decision that a claimant was not entitled PUA benefits because he was "not attached to the labor market"). Nevertheless, I am persuaded by the approach taken in other jurisdictions to address voluntary unemployment. For example, in *Winter v. New Mexico Department of Workforce Solutions* (D.N.M., Civ. No. 21-475 JFR/SCY, filed September 12, 2022) (unreported), 2022 WL 4132740, the federal district court agreed with state administrators that the claimants were precluded from PUA benefits because they had "voluntarily resigned their employment without good cause connected to the work, which renders them disqualified for [UC] benefits under New Mexico law." *Id.* at *6 (citing N.M. Stat. Ann. § 51-1-7(A)(1) (2011)).[10] Similarly, a New Jersey appellate court explained that a claimant must return PUA

---

[10] It is further noteworthy that the New Mexico Department of Workforce Solutions drew a persuasive distinction, arguing that "[claimants] were not ineligible for [UC] benefits—a prerequisite for the receipt of PUA benefits; rather, . . . [claimants] were monetarily *eligible* for [UC] benefits, but were *disqualified* from receiving those benefits 'due to a separation issue.'" *Winter*, 2022 WL 4132740, at *5 (emphasis in original).

benefits because he had resigned from his former employment "voluntarily without good cause attributable" to that employment. *Sullivan v. Bd. of Rev., Dep't of Lab.*, 272 A.3d 44 (N.J. Super. Ct. App. Div. 2022) (citing N.J.S. 43:21-5(a)).

Here, Claimant voluntarily resigned from her position with her employer on December 10, 2020. Bd. Dec. at 2. Claimant sought regular UC benefits but was denied under Section 402(b) of the UC Law. *Id.* Claimant did not appeal that determination. *Id.* Therefore, on this record, Claimant's unemployment is "without cause of a necessitous or compelling nature." 43 P.S. § 802(b). Further, as in *Winter* and *Sullivan*, Claimant's disqualification precludes PUA benefits.

**C. The Board's Finding of Fact No. 6 is Supported by Substantial Evidence**

Claimant also asserts that the Board's finding that her employer provided Claimant with a hospital mask as a safety precaution is not supported by substantial evidence. Pet'r's Br. at 39-40. According to Claimant, her credible testimony established that her employer issued Claimant a single mask along with instructions that the mask was intended for the protection of patients coming to the hospital, not the hospital's employees. *Id.* Claimant therefore concludes that this finding is misleading. *Id.* The Board rejects these assertions and notes further that its subsequent Finding No. 7 adequately acknowledged Claimant's concern that the employer's safety precautions were insufficient. *See* Resp't's Br. at 10-13.

Substantial evidence is relevant evidence that a reasonable person may accept as adequate to support a finding. *Pierce-Boyce v. Unemployment Comp. Bd. of Rev.*, 289 A.3d 130, 136 (Pa. Cmwlth. 2022). When there is substantial evidence to support the Board's findings, they are conclusive on appeal, even if there is contrary evidence of record. *Cambria Cnty. Transit Auth. ("CamTran") v. Unemployment Comp. Bd. of Rev.*, 201 A.3d 941, 947 (Pa. Cmwlth. 2019)

(*CamTran*). The Board is the ultimate factfinder, entitled to make its own determinations on evidentiary weight and witness credibility, and free to accept or reject the testimony of any witness, in whole or in part. *Id.* Resolution of credibility questions and evidentiary conflicts within the Board's discretion "are not subject to re-evaluation on judicial review." *Id.* (internal citation omitted).

On appeal, this Court is bound to examine the testimony in the light most favorable to the prevailing party, affording that party the benefit of all inferences that can be logically and reasonably drawn from the testimony. *Id.* Whether the record contains evidence to support findings other than those made by the factfinder is irrelevant; "the critical inquiry is whether there is evidence to support the findings actually made." *Sipps v. Unemployment Comp. Bd. of Rev.*, 181 A.3d 479, 484 (Pa. Cmwlth. 2018).

Upon review, I would conclude that there is substantial evidence to support the Board's finding. During Claimant's testimony, her counsel asked, "Okay, and were there safety precautions put in place to protect you by the hospital?" Notes of Testimony (N.T.) Hr'g, 4/20/22, at 6. In response, Claimant testified, "We were given a mask." *Id.* A reasonable person would accept this testimony as adequate to support the Board's finding. *See Pierce-Boyce*, 289 A.3d at 136.

Further, in its subsequent Finding No. 7, the Board acknowledged Claimant's concern that the mask provided her insufficient protection. *See* Bd.'s Decision at 2. This finding, too, is supported by substantial evidence. In a follow-up question, counsel asked, "Did you feel that was sufficient to help you?" N.T. Hr'g at 7. Claimant responded, "Absolutely not. And when we were given that mask we were also given a written paper stating that that mask was not for our protection, it would not protect us, it was for the protection of the patient." *Id.*

While together these findings may not credit Claimant's testimony to the extent she would prefer, there is substantial support for them in the record, and I would not disturb them. *See Sipps*, 181 A.3d at 484. Finally, I note that Claimant has asked for no relief and has claimed no particular prejudice resulting from this alleged error. *See* Pet'r's Br. at 39-40. Thus, even if there were sufficient reason to reject this finding, it would not alter my view and would amount to nothing more than a harmless error. For these several reasons, I would hold that Claimant is due no relief on this issue.

## II. CONCLUSION

Claimant asserts that she is a covered individual under Section 2102(a)(3)(A)(ii)(I)(ii) of the CARES Act and, therefore, eligible for PUA benefits. To qualify under subsection (a)(3)(A)(ii)(I)(ii), a claimant must self-certify that she had to quit her job "as a direct result of COVID-19." However, in this case, Claimant was disqualified from receiving unemployment benefits under Section 402(b) of the UC Law because she had resigned from her employer "without cause of a necessitous and compelling nature." 43 P.S. § 802(b). In my view, this disqualification precludes PUA benefits. Further, Claimant's evidentiary challenge is without merit. Accordingly, I would affirm the Board's adjudication, albeit on different grounds.

_____
**LORI A. DUMAS, Judge**